896 F.Supp. 1349 (1995)
UNITED STATES of America, Plaintiff,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO, et al., Defendants.
In re Application I of the ELECTION OFFICER.
No. 88 Civ. 4486 (DNE).
United States District Court, S.D. New York.
August 22, 1995.
*1350 *1351 *1352 Mary Jo White, United States Attorney for Southern District of New York (Christine H. Chung, Karen B. Konigsberg, Assistant United States Attorneys, of counsel), for United States.
Judith A. Scott, General Counsel, International Brotherhood of Teamsters, Washington, DC (John J. Sullivan, Associate General Counsel, Washington, DC, Martha Walfoort, Guerrieri, Edmond & James, Washington, DC, of counsel), for defendant.
Barbara Zack Quindel, Washington, DC (Robert F. O'Brien, Theodore M. Lieverman, Tomar, Simonoff, Adourian & O'Brien, Hadedonfield, NJ, Amy Gladstein, James Reif, Gladstein, Reif & Meginniss, New York City, of counsel), for Election Officer.
Baptiste & Wilder, P.C., Washington, DC (Robert M. Baptiste, Patrick J. Szymanski, of counsel) (Barry I. Levy, Shapiro, Beilly, Rosenberg, Albert & Fox, New York City, of counsel), for Teamsters Local 1150.
Sylvia A. Law, New York City (Duane B. Beeson, Beeson, Tayer & Bodine, San Francisco, CA, of counsel), for Teamsters Local 890.
Shanley & Fisher, P.C., New York City (Mary Jane Armstrong, of counsel) (Duane C. Aldrich, Paul V. Lalli, Kilpatrick & Cody, Atlanta, GA, of counsel), for amicus curiae Pepsi-Cola Company.
Paul Alan Levy, Public Citizen Litigation Group, Washington, DC, for amicus curiae Teamsters For A Democratic Union.

OPINION & ORDER
EDELSTEIN, District Judge:
This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America ("the Government") against, inter alia, defendants International Brotherhood of Teamsters ("the IBT" or "the Union") and the IBT's General Executive Board. This settlement is embodied in the voluntary consent order entered on March 14, 1989 ("the Consent Decree"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through a two-phased implementation of the Consent Decree's various remedial provisions. These provisions provided, in the first phase of the Consent Decree, for three court-appointed officials: the Independent Administrator to oversee the Consent Decree's provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to supervise the electoral process that led up to and included the 1991 election for International Union Office. In the second phase of the Consent Decree, the *1353 Independent Administrator was replaced by a three-member Independent Review Board. Further, paragraph 12(D)(ix) of the Consent Decree provides that "the union defendants consent to the Election Officer, at Government expense, to supervise the 1996 IBT Elections."
Prior to the 1991 IBT election, the 1991 Election Officer, acting pursuant to Paragraph 12(D)(ix) of the Consent Decree, promulgated election rules, which were then presented for this Court's review by application of the Independent Administrator. The Consent Decree further provided that, during the 1991 IBT election process, in addition to applying to this Court for an order regarding the proposed election rules, it was the duty of the Independent Administrator to hear disputes about the conduct or results of the 1991 elections.
The instant application, Election Officer Application I, presents for this Court's review the proposed rules for the 1995-96 IBT election for International Union delegates and officers. By Stipulation and Order dated February 7, 1995, the Consent Decree was amended to reflect the parties' agreement regarding the means of implementing Paragraph 12(D)(ix) of the Consent Decree, which pertains to supervision of the 1995-96 IBT election. See Stipulation & Order Implementing Paragraph 12(D)(ix) of the March 19, 1989 Consent Decree (S.D.N.Y. Feb. 7, 1995) ("the February 7, 1995 Order"). The February 7, 1995 Order states that "it is the intention of the Government and the IBT that the Election Officer function in 1996 as similarly as possible to the 1991 Election Officer," id. at 2, and it confers upon the Election Officer "all rights and duties conferred upon the 1991 Election Officer by paragraph 12 of the Consent Decree," id. ¶ 1, including "the authority granted by Paragraph 12(I) of the Consent Decree to make applications to the Court, after giving notice to specified parties," id. ¶ 3(c). The February 7, 1995 Order further provides for the appointment of an Election Appeals Master to hear disputes about the conduct of the 1995-96 IBT election or the results of that election. Id. ¶ 2. During the 1991 IBT election, the Independent Administrator performed this function.
Currently before this Court is Election Officer Application I, which presents for this Court's review the final set of proposed rules for the 1995-96 IBT election for International Union office. Approximately five years ago, this Court stood at a similar juncture in reviewing the proposed rules for the 1991 IBT elections. At that time I stated:
During the course of the implementation of this Consent Decree, this Court has been called upon to decide matters large and small. But of all the tasks put before it, no question is more central to the ultimate success of this Consent Decree than this proposed framework for the first fully democratic, secret ballot elections in the history of a union which has been the historic marionette of organized crime.
July 10, 1990 Opinion & Order, 742 F.Supp. 94, 97 (S.D.N.Y.1990), aff'd as modified, United States v. International Bhd. of Teamsters, 931 F.2d 177 (2d Cir.1991). In the five years since that decision, many of the sinister forces that allowed the Union to be controlled by corruption have been despoiled. On the anvil of the IBT's first truly democratic election, a democratic Union began to take shape.
It is of paramount importance that the same spirit of vigilance that vitalized the 1991 IBT election energize the 1995-96 IBT election process if the arduous and painstaking work of implementing the Consent Decree is to be preserved and built upon. It cannot be said too often that the minions of organized crime continue to haunt the IBT. These invidious enemies of union democracy continue to thrive with a perverse and persistent energy. Rank and file Teamsters will watch this election with the hope that the Union will continue to be free and democratic. They will constantly be asking themselves whether the Union truly belongs to them. It is not just their interests that are at stake: The American public as a whole will benefit when this union of more than 1.4 million members is freed from the clutches of organized gangsterism. Union corruption takes an enormous toll on its members and the public. The sociological and economic *1354 cost it levies on society and on commerce is incalculable.
The importance of a free and democratic IBT election, and of the rules governing that election, cannot be exaggerated. The Consent Decree is "a unique attempt to cleanse this union" and the election rules "are the linchpin in that effort." Id. As I stated in reviewing the proposed rules for the 1991 IBT election, "[t]his Court will only approve election rules that will guarantee honest, fair, and free elections completely secure from harassment, intimidation, coercion, hooliganism, threats, or any variant of these no matter under what guise." Id. Before examining in detail the proposed election rules and the objections to them, I must emphasize, once again, that the concept of fair, free, and honest elections
means more than just an honest ballot. Fair elections demand that IBT members are given a meaningful, uncoerced choice of candidates. Candidates must be freed of any hesitation about speaking openly on issues, including criticism of the incumbent IBT structure. Candidates must be fearlessly free to communicate those views to the membership. Members must be assured and given confidence that they need not fear to engage in untrammelled discussion.
Id. The realization of these freedoms constitutes the election rules' core mission, a mission that is crucial to the fulfillment of the Consent Decree's goals.

I. The Rules Promulgation Process
Briefly stated, the Election Officer's duties consist of supervising the nominations and elections of Local Union delegates to the 1996 IBT Convention ("the Convention"), and the nominations and elections of International Union officers. The IBT election is a three-step process: (1) the nomination and election by each Local Union of a number of delegates to the Convention, (2) the nomination by the delegates at the Convention of candidates for International Union office, and (3) the election of International Union officers by direct, secret-ballot vote of the IBT membership.
In December 1994, the Election Officer issued proposed rules for the upcoming 1995-96 IBT election and distributed copies of them to each Local Union, all other IBT subordinate bodies, and each member of the IBT General Executive Board. Moreover, copies of the proposed rules were made available to all IBT members who attended hearings on the proposed rules or requested copies. In addition, copies of the proposed rules were sent to the Government and to each of the approximately 130 employers that employs more than 1,000 IBT members. The Election Officer then conducted a series of hearings for IBT members and their representatives in eleven cities throughout the United States and Canada, for the purpose of soliciting comments on the proposed rules. The transcripts of these hearings were filed with the Court and are part of the public record. The Election Officer also solicited written comments on the rules, and sent a letter to each of the approximately 130 employers that employs more than 1,000 IBT members, identifying proposed rules of potential interest to employers. Furthermore, the Election Officer studied the recommendations contained in a three-volume review of the 1991 IBT election prepared by Michael H. Holland, who served as Election Officer for the 1991 IBT election. The Election Officer consulted extensively with Mr. Holland and with individuals who served as regional coordinators for Mr. Holland during the 1991 IBT election. The Election Officer also consulted with the IBT, the Government, and with representatives of the U.S. Department of Labor's Office of Labor-Management Standards.
The final proposed rules for the 1995-96 IBT election are the result of this extensive effort to canvas and consult with all interested parties and to consider the lessons learned from the 1991 IBT election experience. The rules-promulgation procedures summarized above are closely similar to the rules-promulgation procedures used by the Election Officer during the 1991 IBT election process. See July 10, 1990 Opinion and Order, 742 F.Supp. at 98. Thus, the current Election Officer utilized rules-promulgation procedures that were familiar to the IBT, its membership, and its most significant employers. *1355 This Court is satisfied that the Election Officer afforded the IBT membership and subordinate entities, as well as other interested parties, ample opportunity to comment on these proposed rules and to participate in their development.

II. The Final Proposed 1995-96 IBT Election Rules
By application dated April 25, 1995, the Election Officer seeks this Court's approval of the final proposed 1995-96 IBT election rules. In her memorandum of law in support of Election Officer Application I, the Election Officer notes that the proposed rules for the 1995-96 IBT election "provide for [Election Officer] supervision of [the 1995-96 IBT election] in the `expansive and proactive' sense" mandated by this Court during the 1991 IBT election. (Election Officer's Memorandum In Support Of 1995-96 Election Rules ("Election Officer's Memorandum") at 5 (citing October 18, 1989 Opinion & Order, 723 F.Supp. 203, 206 (S.D.N.Y.1989), aff'd, 931 F.2d 177 (2d Cir.1991).
In its papers submitted in response to Election Officer Application I, the Government urges this Court to grant the application and adopt the proposed election rules in their entirety. In a five-page memorandum of law, the IBT notes that the Election Officer did not adopt all of its suggestions, but the IBT nevertheless concludes by urging this Court to adopt the proposed election rules in their entirety. (IBT's Response In Support of Election Officer's Application No. 1 For Order Approving Election Rules at 5.) IBT Local 1150 and IBT Local 890 each filed objections to the proposed election rules. In addition, in a four-page memorandum of law, Pepsi-Cola Company filed one objection to the proposed rules. Finally, Teamsters For A Democratic Union filed a brief that substantially supports the proposed rules but states one objection.
In comprehensive reply papers, the Election Officer opposes each of these objections with the exception of the objection raised by Teamsters For A Democratic Union; in response to this particular objection, the Election Officer has amended the proposed rules to accommodate the concerns raised by this objection.
For the purposes of analysis, the final proposed election rules for the 1995-96 IBT election may be divided into three groups: (1) proposed rules that parallel the election rules adopted during the 1991 IBT election and that have not been objected to; (2) proposed rules that modify the 1991 election rules and that have not been objected to; and (3) proposed rules that modify the 1991 election rules and that have been objected to. In addition, several objections to the proposed election rules concern proposed changes to the rules that the Election Officer rejected during the rules-promulgation process. Each of these matters is discussed in turn.

1. Proposed Rules that Parallel the 1991 Election Rules and Have Not Been Objected To
The salient feature of the proposed rules for the 1995-96 IBT election is the fact that they substantially parallel the 1991 IBT election rules. (See Election Officer's Memorandum at 5.) The election rules proposed in 1991 were adopted by this Court in an Opinion and Order dated July 10, 1990, which modified the rules in certain respects, most significantly to increase and expand the role of the Election Officer in supervising various aspects of the 1991 IBT election. See July 10, 1990 Opinion & Order, 742 F.Supp. at 106-08. This Court's decision was affirmed on appeal, subject to one additional modification of the rules concerning non-member aid to candidates to obtain accounting and legal services. See United States v. International Bhd. of Teamsters, 931 F.2d 177, 189.
This Court is satisfied with those proposed rules for the 1995-96 IBT election that parallel the 1991 election rules and have not been objected to. Maintaining a set of election rules that is, for the most part, already familiar to the IBT, its membership, and IBT employers will facilitate the election process. Moreover, to the extent that the proposed rules parallel the 1991 IBT election rules, they have once already been subjected to the scrutiny of this Court and the Court of Appeals. Since there is no reason to believe that circumstances have changed, these same *1356 rules should govern the 1995-96 IBT election. Accordingly, this Court approves and adopts the first group of rules, i.e., those proposed rules that parallel the 1991 IBT election rules and that have not been objected to.
It should be noted that the proposed rules provide for election of delegates to the IBT Convention by mail ballot, unless the Election Officer determines that there are compelling reasons for in-person balloting. This rule tracks the modification of the Consent Decree contained in the Opinion and Order of this Court dated January 11, 1995, which provides that "[a]ll direct rank-and-file voting by secret ballot ... shall be by mail ballot in accordance with Department of Labor Regulations, except that the Election Officer may determine, in compelling circumstances, that delegate elections in the Local unions need not be conducted by mail ballot." January 11, 1995 Opinion & Order, 159 F.R.D. 437, 440 (S.D.N.Y.1995). Although the Consent Decree previously provided for in-person balloting, this Court approved election rules that permitted Local Union delegates in the 1991 IBT election to be elected by mail-ballot voting, see July 10, 1990 Opinion & Order, 742 F.Supp. 94, and subsequently permitted mail-ballot voting in the 1991 election for International Union office. As a result of these court orders, the bulk of the balloting during the 1991 IBT elections was by mail. The Election Officer notes that mail-ballot voting reduces the possibility of voter intimidation or harassment and tends to increase membership participation in union elections. (Election Officer's Memorandum at 8.)

2. Proposed Rules that Modify the 1991 Election Rules and That Have Not Been Objected To
Although the proposed rules are substantially similar to those adopted during the 1991 IBT election process, the Election Officer has proposed some rules that modify the 1991 IBT election rules. While several of these proposed rules are the subject of objections, the majority of them are not. The modifications proposed by the Election Officer are a product of her review of the 1991 IBT election process and her consideration of the myriad comments submitted during the promulgation process that led to the instant application. For the most part, these modifications represent relatively minor adjustments to the election procedures that were used during the 1991 IBT election and reflect the lessons learned from that election. The following is a review of these changes and the reasoning that supports them.
Three of the proposed modifications to which no objections have been filed affect the structure of the 1995-96 IBT election. First, in order to maximize participation in the 1995-96 IBT election by Local Unions that represent employees in the seasonal food industry, the proposed rules empower the Election Officer to direct that delegate elections in such Local Unions be held when seasonal employment is likely to be at a peak. The Election Officer plans to schedule these elections as close to the peak of the season as is consistent with the overall 1995-96 IBT election schedule.
Second, the proposed rules provide that the number of Vice Presidents to be elected in each region shall be determined by the number of IBT members in that region, based on a calculation of the membership of each region to be conducted in September 1995. The election of regional Vice Presidents in the 1991 IBT election was governed by Paragraph 12(D)(iii) of the Consent Decree, which called for election of a specified number of Vice Presidents from each region. The election of regional Vice Presidents in the 1995-96 IBT election, by contrast, is governed by Article IV, Section 1(c) of the IBT Constitution, which provides that the number of Vice Presidents from each region is to be determined by reference to the number of members in that region.
Third, the proposed rules provide that the general membership shall elect Trustees by direct, secret, mail balloting. In the 1991 IBT election, the delegates to the IBT Convention elected the Trustees. At the 1991 IBT Convention, however, the IBT Constitution was amended to provide for election of Trustees by direct, secret-ballot vote of all IBT members in good standing. Subsequently, by Order dated December 21, 1994, this Court amended the Consent Decree to *1357 provide for direct election of Trustees by the general membership in secret ballot voting. See December 21, 1994 Order (S.D.N.Y. 1994). Thus, the proposed modification tracks these amendments.
Twelve of the proposed modifications to which no objections have been filed affect how the 1995-96 IBT election will be conducted. First, the proposed rules require each Local Union to provide the Election Officer with an original of each newsletter, newspaper, magazine, or other periodical made available to its membership after January 1, 1992. In addition, the proposed rules require the IBT and each subordinate or affiliated body to submit any such periodical literature published after January 1, 1992, to the Election Officer by September 30, 1995, and thereafter to submit any such periodical literature upon publication. The purpose of these requirements is to enhance the Election Officer's ability to obtain information and learn of developments that may be relevant to the 1995-96 IBT election process. (See Election Officer's Memorandum at 12.) Moreover, such materials may prove useful to the Election Officer in reviewing protests alleging unlawful use of Union publications. Id.
Second, the proposed rules require Local Unions to send to each member, by first class mail to the last known home address, at least twenty-one days in advance, notice of any meeting at which nominations for delegates to the IBT Convention will be conducted. The Election Officer proposes this rule in order to eliminate the risk that a member might not see a notice published only in a union newspaper because that member either does not read the union newspaper in which the notice is published or reads the newspaper but fails to observe the notice. Furthermore, letters returned by the U.S. Postal Service will serve to notify the Union and the Election Officer early in the election process of addresses that need to be updated so that those members may receive ballots and other election-related mailings.
Third, the proposed rules allow members to request, in advance of the meeting at which the nominations for delegates will be conducted, verification of their eligibility to be a candidate, to nominate a candidate, or to second a nomination. Such verification is to be provided by the Election Officer rather than the Local Union. The Election Officer observes that this proposed rule denies to incumbents who are considering running for delegate the unfair advantage of learning in advance the identity of their opposition. The proposed rule also reduces the possibility of coercion of would-be candidates before the nominations meeting.
Fourth, the proposed rules allow a Local Union member to nominate or second the nomination of a candidate for delegate in writing, and to submit such written nominations or seconds to the Election Officer directly rather than to the Local Union. During the 1991 IBT elections, written nominations were permitted only in limited circumstances. The Election Officer argues that allowing nominations and seconds by eligible members to be in writing, without any of the restrictions on written nominations and seconds contained in the 1991 election rules, and permitting these written nominations and seconds to be submitted to the Election Officer rather than the Local Union will reduce the possibility and the fear of physical intimidation of nominators or seconds at a nominations meeting. The Election Officer further argues that this proposed rule also levels the playing field by denying to incumbents who are considering running for delegate the advantage of learning in advance the identity of their opposition.
Fifth, the proposed rules require each Local Union promptly to post on all Union bulletin boards a variety of election-related notices. These notices must be printed on neutral letterhead, devoid of the names of current officers or other staff members. The Election Officer states that the purpose of this proposed rule is to eliminate any unfair advantage to incumbents who are considering running for delegate and whose names would otherwise appear on the letterhead used for posting notices.
Sixth, the proposed rules incorporate by reference the election-related provisions of the Labor-Management Reporting & Disclosure Act of 1959, as amended ("the LMRDA"), 29 U.S.C. §§ 401 et seq. Although *1358 the IBT, all IBT subordinate bodies, and all IBT members, employers, and other entities are obligated to comply with the LMRDA during the course of the 1995-96 IBT election regardless of this proposed rule, the rule authorizes the Election Officer to enforce the rights and obligations contained in the LMRDA that pertain to the 1995-96 IBT election. The Election Officer notes that her ability to enforce the rights and obligations contained in the LMRDA "minimizes the possibility of a valid postelection complaint being filed with the Department of Labor pursuant to LMRDA Section 402, 29 U.S.C. § 482, leading to the necessity for a rerun of the election." (Election Officer's Memorandum at 16.)
Seventh, the proposed rules provide that candidates for delegate and candidates accredited or nominated for International Union office may inspect any collective bargaining agreement covering members of a Local Union and may obtain a list of work site locations of that Local Union's members. The Election Officer observes that information contained in a collective bargaining agreement may be relevant to the welfare of the Local Union that is involved in the agreement. Hence, a candidate running against an incumbent who helped to negotiate a particular bargaining agreement may legitimately wish to refer to that agreement in his campaign. Similarly, access to a list of work site locations of members of a particular Local Union is obviously useful to a candidate for delegate or for International Union office for purposes of campaigning.
Eighth, the proposed rules require the IBT to comply with any reasonable request by a candidate for delegate or International Union office to mail campaign literature to Union members who are potential voters, at that candidate's expense, regardless of how early in the election process such a request is made. The Election Officer notes that early mailings enhance a candidate's ability to raise campaign funds and that the strategy regarding the timing and frequency of mailings is best left to the candidates themselves.
Ninth, the proposed rules provide that a copy of the appropriate membership list may be released to accredited or nominated candidates for International Union office forty-five days in advance of the mailing out of ballots. The 1991 IBT election rules provided that such lists could only be released thirty days in advance of the mailing out of ballots. The Election Officer notes that membership lists are primarily useful to candidates for the purpose of telephoning the relevant membership pool to solicit support. The proposed rule affords candidates an additional fifteen days in which to use such lists for the purposes of campaigning.
Tenth, the proposed rules provide that balloting for delegate elections at each Local Union may not begin sooner than thirty days after the final nominations meeting at that Local Union. The proposed rules also provide that the deadline for return of ballots may not be less than twenty-one days after the ballots are mailed. The Election Officer argues that these minimum time periods allow candidates a meaningful opportunity to campaign after the final nominations meeting, and prevent Local Unions from setting deadlines that effectively foreclose any meaningful period for campaigning after candidates have been nominated.
Eleventh, the proposed rules prohibit campaign contributions from members who are also employers, except that such contributions are permitted when the contribution comes solely from the member as an individual and not from an entity that is an employer. As originally set forth in the final proposed election rules and the Election Officer's Memorandum, this rule simply prohibited contributions from members who are also employers. As such, the rule represented a modification of the 1991 election rules, which generally prohibited contributions by employers but permitted contributions by employers if they were IBT members. Subsequent to the adoption of the 1991 election rules, a U.S. district court in the District of Hawaii held that a contribution to promote a candidate for union office given by a member of an IBT Local Union who was also an employer violated LMRDA Section 401(g), 29 U.S.C. § 481(g). See Martin v. IBT Local 996, No. 89-00241, 1991 WL 346365 (D.Haw. Aug. 12, 1991). In light of the close similarity between LMRDA section 401(g) and the *1359 proposed rules, as well as the fact that the election-related provisions of the LMRDA are incorporated by reference into the proposed rules, the Election Officer initially determined that Martin v. IBT Local 996 required an election rule that prohibited contributions from members who are also employers.
The proposed rule concerning contributions by employer-members was the subject of an objection by Teamsters For A Democratic Union, which argued that neither the Consent Decree nor the IBT Constitution prohibits members who are also employers from making campaign contributions. Moreover, Teamsters For A Democratic Union argued that Puma v. Sheet Metal Workers' International Association, Local Union No. 137, 862 F.Supp. 1077, 1081 (S.D.N.Y.1994), Martin v. International Organization of Masters, Mates and Pilots, 786 F.Supp. 1230, 1237-38 (D.Md.1992), and Myers v. Hoisting & Portable Local 513, International Union of Operating Engineers, 653 F.Supp. 500, 504 (E.D.Mo.1987), each stand for the proposition that when an employer-member who contributes to a campaign for union office acts in his individual capacity as a union member and does not use his business's resources, assets, or name, the contribution will be treated as coming from a union member, rather than from an "employer" as defined in the LMRDA.
Upon reconsideration, the Election Officer agreed with Teamsters For A Democratic Union. In the Reply Memorandum of the Election Officer in Support of the Motion to Approve the 1995-1996 Election Rules ("Election Officer's Reply Memorandum"), the Election Officer concedes that Martin v. IBT Local 996 is not inconsistent with the cases cited by Teamsters For A Democratic Union because it involved contributions from an employer-member's business, in the form of services and materials, rather than a contribution from that member in his individual capacity. Accordingly, the Election Officer reformulated the proposed rule concerning contributions by employer-members to permit such a contribution if it comes solely from a member as an individual and not from any entity that is an employer.[1]
Twelfth, the proposed rules require each candidate to submit to the Election Officer a campaign financing and expenditure report, which details funds received and expended in connection with that individual's candidacy. Each nominated candidate for International Union office may inspect reports filed by any other candidate. In addition, the proposed rules likewise require all independent committees that support candidates for International Union office to submit such reports to the Election Officer. In a decision concerning the 1991 IBT election, the Second Circuit ruled that independent committees could not be required to file for inspection campaign financing and expenditure reports. See United States v. International Bhd. of Teamsters, 968 F.2d 1506 (2d Cir.1992). In keeping with that decision, the proposed rules provide that candidates may inspect campaign financing and expenditure reports filed by an independent committee only with that committee's express prior written consent.
Four of the proposed modifications to which no objections have been filed affect the enforcement of the 1995-96 IBT election rules. First, in keeping with the 1991 IBT election rules, the proposed rules provide that preelection protests in general must be filed within two working days of the day the protestor becomes aware, or reasonably should have become aware, of the action protested. Protests alleging violations of the LMRDA that occurred before or within twenty-eight days of the issuance, in April 1995, of the final proposed election rules, however, may be filed within thirty days of the date the Election Officer issued the proposed rules. The Election Officer states that the purpose of this proposed rule is to ensure that members have a reasonable opportunity after issuance of the proposed rules to learn of and exercise their rights under those rules. The Election Officer deferred resolution of all protests until after the issuance of the final proposed rules, and determined that *1360 protests concerning alleged violations of the LMRDA that occurred before the final proposed rules were issued should be resolved within a reasonable period of time after the proposed rules were issued. Thus, the thirty-day window is designed to afford the membership a reasonable period of time in which to become aware of, and familiar with, the proposed rules.
Second, the proposed rules codify procedures for protests and protest appeals adhered to during the 1991 IBT election. The proposed rules provide that the Election Officer shall provide a copy of any protest to any person or entity that the Election Officer determines may be the subject of that protest. Those persons or entities may present to the Election Officer evidence and legal argument on their behalf and may timely appeal the decision of the Election Officer to the Election Appeals Master. The Election Appeals Master is similarly required to notify all persons or entities that may be affected by a protest appeal.
Third, the proposed rules extend the schedule for processing of protests and protest appeals. The 1991 election rules called upon the Election Officer to investigate and decide any preelection protest within five days of the date the protest was filed. If the decision of the Election Officer was appealed, the rules called upon the Independent Administrator to conduct a hearing within three days and to render a decision on the protest appeal within two days thereafter. The Election Officer states that during the 1991 election process, this schedule proved unrealistic. Accordingly, the proposed rules provide that the Election Officer shall investigate and decide a preelection protest within seven days of the filing of that protest. If the Election Officer's decision is appealed, the proposed rules provide for a hearing before the Election Appeals Master within four days of the filing of the appeal and a decision within three days thereafter. The Election Officer argues that this increase in the number of days allotted for the processing of preelection protests is designed to maintain expedited processing of protests and protest appeals within the framework of a more realistic schedule.
For protests filed within the first thirty days of the issuance of the proposed rules, during which time the Election Officer anticipates a considerable backlog of protests, the proposed rules provide for a decision on protests by the Election Officer within twenty-one days of the filing of each protest and a decision by the Election Appeals Master within ten days of the hearing on each protest appeal.
The proposed rules also partly extend the schedule for processing postelection protests, which include all protests concerning conduct during or after the counting of ballots. The proposed rules provide for investigation and resolution of any postelection protest concerning a delegate election within ten days of the filing of the protest, and the proposed rules provide for a hearing on any appeal within four days of the filing of the appeal. The schedule for the processing of postelection protests otherwise replicates the schedule used in the 1991 IBT election.
Fourth, the proposed rules provide that the Election Officer shall investigate and resolve any timely postelection protest alleging retaliation for the exercise of rights protected by the election rules, regardless of whether such retaliatory conduct may have affected the outcome of an election. The 1991 election rules provided that postelection protests would be considered and remedied only if the alleged violation of the election rules might have affected the outcome of an election. In United States v. International Bhd. of Teamsters ("Ellis"), 3 F.3d 634 (2d Cir. 1993), the Second Circuit held that the 1991 Election Officer lacked authority under the 1991 election rules to redress the discharge from employment of an IBT member who was fired for engaging in activity protected by the election rules. The Court ruled that the Election Officer lacked such authority under the 1991 IBT election rules because the discharge from employment of the IBT member did not affect the outcome of an election. The Election Officer argues that the rule should be modified in order to empower the Election Officer to protect the IBT membership from any form of retaliation for the exercise of rights protected by the election rules, regardless of whether the retaliatory *1361 conduct may have affected the outcome of an election.
As noted above, no objections have been filed with regard to any of the proposed modifications to the 1991 election rules discussed in this section. Moreover, the Court finds that these proposed modifications reflect the many lessons learned from the 1991 IBT election and represent sensible changes and adjustments to the 1991 election rules. In some instances, the proposed modifications track court orders and amendments to the Consent Decree or otherwise adjust the election rules to conform to new court decisions. In other instances, the proposed modifications either build on experience gained during the 1991 IBT election or are based on renewed consideration of the election rules. Accordingly, this Court approves and adopts the second group of proposed election rules, i.e., those proposed rules that modify the election rules adopted during the 1991 IBT election and that have not been objected to.

3. Proposed Rules That Modify the 1991 Election Rules and That Are the Subject of an Objection
The Election Officer has proposed some election rules that modify the 1991 IBT election rules and that are the subject of an objection. The following is a review of these changes and the objections to them.

a. Centralized Locations for the Printing, Mailing, and Counting of Ballots for Delegate Elections
The proposed rules provide that ballots for delegate elections will be printed and mailed from two centralized locations, one in the United States and one in Canada. Ballots will be returned to regional centers for counting. During the 1991 IBT election process, the Election Officer negotiated a contract with a different printer and mail house for each of the many election locations throughout the United States and Canada. The Election Officer notes that finding and negotiating separate contracts with unionized printers and mail houses in each election locale proved onerous and inefficient and rendered the Election Officer's supervisory duties more difficult to carry out. The proposed rules for the 1995-96 IBT election remedy these problems by centralizing the printing and mailing of ballots. In addition, the proposed rules permit a nominated candidate to designate any IBT member in good standing to act as an observer at the printing and mailing of ballots.
IBT Local 1150 objects to the centralization of ballot printing and mailing on the ground that it effectively precludes candidates in Local Union elections from observing the printing and mailing of ballots. Local 1150 contends further that regional counting of ballots may preclude a substantial number of candidates from having observers at the ballot count. In addition, Local 1150 argues that if the printing and mailing of ballots is centralized in Washington, D.C., IBT General President Ron Carey will gain an unfair advantage in that there are hundreds of IBT members working for Mr. Carey at IBT headquarters in Washington who could easily act as observers for pro-Carey delegate candidates. Local 1150 proposes, instead, that printing, mailing, and counting of ballots for each election take place at a location within the geographic region governed by the local Joint Council. Local 1150 argues that such an arrangement would facilitate greater participation by candidates and their observers.
While Local 1150's proposal might make it somewhat easier for delegate candidates to send representatives to observe the printing, mailing, and counting of ballots, the burden of implementing such a proposal clearly outweighs its benefits. As the Election Officer concluded from her review of the 1991 IBT election experience, finding and negotiating contracts with a unionized printer and a unionized mail house in each election locale is difficult and time-consuming. More importantly, centralizing the printing, mailing, and counting of ballots increases the Election Officer's ability to maintain the security of the balloting process. On balance, the interests of security and administrative efficiency substantially outweigh any benefits to candidates that might accrue by implementing a local ballot-processing plan. Accordingly, the objection is overruled.
*1362 In proposing the use of centralized printing and mailing, a schema must be spelled out in clear and unambiguous terms. The proposed rule will require the Election Officer to award several large contracts to private firms for the printing and mailing of ballots. It is of paramount importance to the administration of the Consent Decree that contracts of this size not be awarded to any firm with ties to organized crime or any other conflict of interest, or any firm of illrepute. Rank and file Teamsters are entitled to assurance that such contracts are not awarded on the basis of patronage, nepotism, or other forms of favoritism. Accordingly, the Election Officer is directed to submit to this Court a report, which will become part of the public record of this case, describing the criteria used in the selection of the printing and mailing houses for the 1995-96 IBT election. In addition, the Election Officer is directed to request the Federal Bureau of Investigation to provide information regarding the firms selected by the Election Officer to ensure that there are no conflicts of interest or other infirmities that would disqualify any of those firms. A summary of this information should be included in the Election Officer's report. In the event that the Federal Bureau of Investigation is unavailable for this assignment, the Election Officer is authorized to obtain the services of an independent, well-reputed investigative agency with a well known history of integrity.

b. Access to Local Union Plans
The proposed rules require each Local Union to submit a Local Union Plan to assist the Election Officer in determining the appropriate schedule for that Local Union's delegate elections. The proposed rules provide further that any member of the Local Union, any candidate for International Union office, the IBT, and any subordinate IBT entity may inspect and obtain a copy of the Local Union Plan. In addition, each Local Union is required to post a notice on Local bulletin boards advising members of the submission of the Local Union Plan and of their right to inspect it, and any member has the right to submit written comments to the Election Officer concerning the Local Union Plan submitted by that member's Local Union. Each Local is further required, once the Election Officer has approved the Local Union Plan, to post a copy of the Local Union Plan summary, which is prepared by the Election Officer.
Local 1150 objects to the requirement that each Local Union make its Local Union Plan available to the IBT. Local 1150 points out that the 1991 IBT election rules only required each Local Union to make its Local Union Plan available to its own members or any candidate for International Union office. Local 1150 argues that the proposed modification, which includes the IBT among the list of persons and entities entitled to obtain copies of Local Union Plans, creates the appearance of favoritism toward the IBT and, therefore, of favoritism toward IBT General President Ron Carey.
This Court agrees with the Election Officer that the proposed modification serves the goal of rendering the 1995-96 IBT election more open and democratic by making Local Union Plans available to a wider group of interested IBT entities. (See Election Officer's Reply Memorandum at 31-32). Furthermore, there is simply no good reason to prevent the IBT from obtaining copies of Local Union Plans while at the same time allowing members and candidates to obtain them. The notion that the proposed modification constitutes a form of indirect favoritism toward Mr. Carey lacks even the slightest veneer of legitimacy, logic, or reason. Accordingly, the objection is overruled.

c. Prior Review of Union Publications by the Election Officer
The proposed rules provide that if the IBT or any subordinate body finances any publication to be distributed to the membership between October 1, 1996, and December 20, 1996, that publication must be submitted to the Election Officer for approval prior to publication. This rule is designed to enable the Election Officer to enforce those provisions of the proposed rules that prohibit use of publications that are financed directly or indirectly by the IBT or any subordinate body to promote a candidate for International Union office. The Election Officer argues *1363 that violations of these provisions cannot effectively be remedied if such violations occur immediately prior to or during balloting. Accordingly, the Election Officer contends that the only effective means of preventing such violations from occurring immediately prior to or during balloting is to have the Election Officer review all materials financed by the IBT or any subordinate body prior to publication.
IBT Local 1150 argues that this rule constitutes a prior restraint prohibited by the First Amendment to the United States Constitution. Local 1150 contends that the current Election Officer, unlike the officers previously appointed pursuant to the Consent Decree, is a "state actor" because the 1995-96 IBT election is governed by federal statute and the Election Officer is appointed by the Court and paid by the Government. In addition, Local 1150 argues that, in approving and enforcing the 1995-96 IBT election rules, this Court supplies the state action that implicates the First Amendment.
It is well settled that constitutional provisions apply only to state action. See United States v. International Bhd. of Teamsters ("Senese"), 941 F.2d 1292, 1295-96 (2d Cir.1991) (citing Blum v. Yaretsky, 457 U.S. 991, 1002, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982)), cert. denied, 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). "To qualify as state action, the conduct in question `must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State by a person for whom the State is responsible,' and `the party charged with the [conduct] must be a person who may fairly be said to be a state actor.'" Id. (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753-54, 73 L.Ed.2d 482 (1982)). Applying this two-prong test, the Second Circuit has held that the officers appointed pursuant to the Consent Decree are not state actors. See United States v. International Bhd. of Teamsters ("Star Market"), 954 F.2d 801, 806-07 (2d Cir.1992) (1991 Election Officer ruling, subsequently affirmed by Independent Administrator, held not state action); Senese, 941 F.2d at 1295-97 (Independent Administrator held not state actor).
Although Local 1150 recognizes that the Second Circuit has ruled that the 1991 Election Officer and the Independent Administrator were not state actors, Local 1150 argues that the 1995-96 Election Officer is a state actor because, pursuant to the Consent Decree, the Government will fund the supervision of the 1995-96 IBT election. Local 1150's argument misses the point. The 1995-96 Election Officer is not a state actor because she derives her authority from the IBT Constitution, which is a private agreement. Paragraph 9(a) of the Consent Decree provides that the IBT Constitution is deemed amended "to incorporate and conform with all of the terms set forth in this order." The Consent Decree provided for a Court-appointed Election Officer to supervise the 1991 IBT election. Paragraph 12(D)(ix) of the Consent Decree adds that "the union defendants consent to the Election Officer, at Government expense, to supervise the 1996 IBT elections." Hence, the 1995-96 Election Officer, like the 1991 Election Officer, acts pursuant to the International Constitution  a private agreement  and not pursuant to a right or privilege created by the state. See Senese, 941 F.2d at 1296.
Moreover, Local 1150's argument is flawed because the Election Officer cannot "`fairly be said to be a state actor.'" Id. (quoting Lugar, 457 U.S. at 937, 102 S.Ct. at 2753). In Senese, the Second Circuit examined the issue of whether the Independent Administrator, who was appointed pursuant to the Consent Decree, was a state actor when the Independent Administrator took certain disciplinary actions against respondents Senese and Talerico. The court explained that "[t]he question is not whether the decision to establish the [Independent Administrator] was state action, but rather whether the [Independent Administrator's] decision to sanction Senese and Talerico may be `fairly attributable' to the Government." Id. The Senese court concluded that "[b]ecause the [Independent Administrator's] decision to sanction Senese and Talerico was guided only by the IBT Constitution, and not by any state or federal authority, Senese and Talerico's characterization of the [Independent Administrator's] decision as state action must *1364 fail." Id. Applying this test to the 1995-96 Election Officer, it is clear that she is not a state actor. Because the Election Officer's actions are guided by the IBT Constitution and the Consent Decree, and not by any state or federal authority, her decisions cannot be "`fairly attributable' to the Government." Id. (quoting Lugar, 457 U.S. at 937, 102 S.Ct. at 2753). Thus, Local 1150 cannot satisfy either prong of the state-action test.
Local 1150's argument that this Court's approval of the election rules supplies the requisite state action to trigger the First Amendment is equally unavailing. In Senese, the Second Circuit ruled that this Court's affirmance of a disciplinary decision by the Independent Administrator did not supply the requisite state action needed to trigger due process rights. See Senese, 941 F.2d at 1297; see also Star Market, 954 F.2d at 806-07 (district court's affirmance of Independent Administrator's affirmance of 1991 Election Officer decision does not supply requisite state action). The Senese court explained that "governmental oversight of a private institution does not convert the institution's decisions into those of the State, as long as the decision in question is based on the institution's independent assessment of its own policies and needs." 941 F.2d at 1297. The Senese court's ruling applies with equal force to this Court's approval of the 1995-96 IBT election rules.
Because the Election Officer is not a state actor and because the 1995-96 IBT election rules do not constitute state action, Local 1150's contention that the instant proposed rule violates the First Amendment is without merit. Accordingly, the objection is overruled.

d. Limited Right of Access to Employer Premises
The proposed rules provide that a candidate for delegate or International Union office has a limited, rebuttable right to campaign in parking lots used by members to park their vehicles in connection with their employment. The proposed rules also confer on IBT members the reciprocal right to receive campaign advocacy in employee parking lots. The 1991 IBT election rules addressed the issue of campaigning on employer premises by prohibiting restrictions on IBT members' "pre-existing rights" to campaign on employer property. While the proposed rules reiterate this provision as well, see Rules for the 1995-1996 IBT International Union Delegate and Officer Election, Art. VIII, Sec. 11(d), the rules also expressly provide for a limited right of access to employer premises for the purpose of campaigning for the 1995-96 IBT election.
During the 1991 IBT election, the election rules prohibited any restrictions on IBT members' "pre-existing rights" to campaign on employer premises, and this prohibition was the subject of numerous election protests, most of which involved attempts by candidates or their supporters to campaign on the premises of employers that did not employ them. In 1991, the principal preexisting right cited by non-employee Union members in their attempts to gain access to employer premises for the purpose of campaigning was derived from Section 7 of the National Labor Relations Act, as amended ("NLRA"), 29 U.S.C. § 157. In Jean Country, 291 N.L.R.B. 11, 1988 WL 214053 (1988), the National Labor Relations Board ("the Board") held that under Section 7 of the NLRA, non-employee access to employer premises for union organizing activity should be determined by balancing the degree of impairment of the statutory right to organize if access were denied against the degree of impairment of the private property right if access were granted. The Board noted that the availability of reasonably effective alternative means of communication was an especially significant consideration in balancing these interests.
After the 1991 IBT election, the Supreme Court held in Lechmere, Inc. v. NLRB, 502 U.S. 527, 538, 112 S.Ct. 841, 848-49, 117 L.Ed.2d 79 (1992), that under Section 7 of the NLRA, non-employees generally do not have a right to campaign on employer premises. Moreover, the Court ruled that a balancing of competing interests is permissible only if it is first found that no reasonably effective access to employees for union organizing purposes exists outside the employer's property. The Lechmere court noted that a *1365 lack of such alternative access would only exist in unusual circumstances, such as in cases involving logging or mining camps or mountain resort hotels. Id. at 539-40, 112 S.Ct. at 849-50. Lechmere disapproved the NLRB's balancing test in Jean Country and substantially reduced the scope of a nonemployee-union organizer's rights under Section 7 of the NLRA.
During the 1991 IBT election process, NLRA Section 7 as interpreted by Jean Country afforded IBT members a "pre-existing right," which in most instances ensured access to employer premises for campaigning purposes. In promulgating proposed rules for the 1995-96 IBT election, the Election officer determined that, in view of the Supreme Court's decision in Lechmere, NLRA Section 7 no longer provides an IBT member with a right of access to employer premises for the purpose of campaigning. Hence, the prohibition in the 1991 election rules against restriction's on IBT members' "pre-existing rights," alone, would not provide such a right of access.
Accordingly, the proposed rules set forth an independent basis for an IBT member's limited right of access to employer premises for the purpose of campaigning in the 1995-96 IBT election. The proposed rules limit this right of access to employee parking lots. IBT members only have a right of access for the purpose of campaigning for delegate or International Union office and only during hours when a parking lot is normally open to IBT members. The proposed rules create no right to campaign or to receive campaign advocacy during working hours, and campaign activity that would materially interfere with the normal business activities of the employer is not permitted. Furthermore, an employer may require a person seeking access to an employee parking lot to produce reasonable identification in order to assure that such a person is a candidate or other IBT member entitled to such access. In addition, the right is presumptive, and an employer may rebut that presumption by demonstrating to the Election Officer that access to that particular employer's employee parking lot is neither necessary nor appropriate to meaningful exercise of democratic rights in the course of the 1995-96 IBT election.
The Election Officer argues that an express right of access to employer premises for the purpose of campaigning is essential to ensure that the IBT membership will be well informed during the 1995-96 IBT election. As discussed at length in the Election Officer's Memorandum, many of the methods of campaigning that other labor unions use during elections are ineffective in the context of the IBT. In many instances, the particularities of Teamsters' employment render mailings, telephone campaigns, home visits, and alternative means of face-to-face campaigning impractical, ineffective, or unaffordable. (Election Officer's Memorandum at 21-25.). Moreover, it is impractical to restrict campaigning to public areas outside employer premises. Not only would such a restriction reduce opportunities for face-to-face campaigning to brief encounters through the windows of cars entering or exiting a work site, but this alternative also raises an addition concern regarding traffic safety. Id. at 24.
The Election Officer argues further that the proposed right of access levels the playing field between incumbents and challengers. Incumbent Union officers and agents, who may have developed amicable relationships with employers, typically have access to employer premises by way of union-access provisions in collective bargaining agreements. Without the proposed rule, incumbents would have an unfair advantage over challengers. (Election Officer's Reply Memorandum at 8.) Both the Government and Teamsters For A Democratic Union strongly support the proposed rule. (See Government's Response to Election Officer Application No. 1 Seeking Court Approval of Rules for the 1995-96 IBT International Union Delegate and Officer Election ("Government's Response Memorandum") at 7-20; Memorandum of Teamsters For A Democratic Union In Substantial Support of the 1995-96 Election Rules at 11-15.)
Pepsi-Cola Company ("Pepsi") filed an objection to the proposed right of access to employer premises. In a four-page memorandum of law, Pepsi, which employs approximately 7,500 Teamsters, contends that the *1366 rule contravenes the Supreme Court's ruling in Lechmere.
Contrary to Pepsi's argument, however, Lechmere does not bar the proposed rule. Lechmere involved a balancing of an employer's property rights against employees' rights under Section 7 of the NLRA. In Lechmere, nonemployee union organizers sought access to an employee parking lot on an employer's property in order to unionize employees. Although Lechmere greatly limits a nonemployee union organizer's right of access to employer premises under Section 7, the Supreme Court only addressed the rights derived from the NLRA.
By contrast, the right of access contemplated by the proposed election rule is not derived from Section 7 of the NLRA, but rather from the Consent Decree. Indeed, it is evident that the Election Officer was well aware of the Lechmere holding and that the Election Officer sought to provide IBT members with a right of access that was derived from the Consent Decree. Thus, Lechmere is inapposite.
Although Lechmere does not prohibit the proposed right of access, this Court must determine whether a basis exists in law for this right. Moreover, even if a basis for the proposed rule exists, this Court must decide whether such a rule is warranted in the 1995-96 IBT election.
The Consent Decree and this Court's authority to enforce the Consent Decree under the All Writs Act provide a basis for the right of access set forth in the proposed rule. The Second Circuit has recognized that the Consent Decree provides an independent source of rights for IBT members that may extend beyond the rights provided under labor law. In holding that the Consent decree is "undeniably a source of rights separate and distinct" from the rights enjoyed by employees under a collective bargaining agreement, for example, the Second Circuit observed that the Consent Decree "is an attempt to rebuild the infrastructure of an entire national labor organization." Star Market, 954 F.2d at 809-810. Under the Consent Decree, this Court bears ultimate responsibility for ensuring that the IBT is "maintained democratically, with integrity, and for the sole benefit of its members and without unlawful influence." Consent Decree at 2. As previously discussed, in order to achieve this goal, it is critical that the 1995-96 IBT election is conducted in a fair, open, and democratic fashion.
Moreover, the All Writs Act authorizes this Court to "issue all writs necessary or appropriate in aid of [its] ... jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (1988). This authority extends to nonparties to the Consent Decree, in keeping with the Supreme Court's holding that
[t]he power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.
United States v. New York Tel. Co., 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) (citations omitted); see also United States v. International Bhd. of Teamsters ("All Writs Order"), 907 F.2d 277, 280-81 (2d Cir.1990); U.S. v. International Bhd. of Teamsters ("Yellow Freight"), 948 F.2d 98, 104-05 (2d Cir.1991), vacated as moot, ___ U.S. ___, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992); Star Market, 954 F.2d at 807.
In the instant case, this Court's authority to enforce the Consent Decree extends not only to the parties to the Consent Decree but also to employers who "are in a position to frustrate the implementation of [the Consent Decree] or the proper administration of justice." New York Tel. Co., 434 U.S. at 174, 98 S.Ct. at 373. Employers could frustrate the Consent Decree's goal of ensuring open, free, and democratic IBT elections if they prohibited all campaigning on their property. As discussed below, the only way to ensure that each candidate has a meaningful opportunity to meet with the electorate and to explain his or her views is to provide candidates with a right of access to employer premises. Therefore, although employers "are not parties to the original *1367 action," this Court's authority under the All Writs Act extends to employers because they are in a position to influence campaigning during the 1995-96 IBT election and such influence could have profound implications for the Consent Decree.
Not only is the proposed rule necessary in aid of this Court's jurisdiction over the Consent Decree, but enforcement of the rule is "agreeable to the usages and principles of law" because the rule sets forth procedures that limit the intrusion on an employer's property rights to a minimum. The right of access is extremely circumscribed in its scope. As discussed above, the rule provides no right to enter any area other than an employee parking lot, and IBT members can gain access only during hours when the parking lot is normally open to employees. IBT members only have a right of access for the purpose of campaigning for delegate or International Union office and only during hours when a parking lot is normally open to IBT members. The rule creates no right to campaign or to receive campaign advocacy during working hours, and campaign activity that would materially interfere with the normal business activities of the employer is not permitted. An employer may require a person seeking access to an employee parking lot to produce reasonable identification in order to assure that such a person is a candidate or other IBT member entitled to such access. In addition, the right of access afforded by the rule is a presumptive right only, and any employer may rebut this presumption by demonstrating to the Election Officer that the exercise of the right by IBT members with regard to that employer is "neither necessary nor appropriate to meaningful campaigning or IBT members' becoming informed about candidates." (See Election Officer's Memorandum at 29.)
The proposed rule also is "agreeable to the usages and principles of law" because it protects a nonparty's "opportunity to seek relief from it in the district court." In re Baldwin-United Corp., 770 F.2d 328, 340 (2d Cir.1985). The proposed rule affords employers full procedural protections by giving any employer the opportunity to apply to the Election Officer for an exemption from the rule. If the Election Officer denies the requested exemption, an employer may appeal the Election Officer's decision to the Election Appeals Master, and, ultimately, to this Court.
Moreover, this Court finds that, in the context of the IBT, the limited right of access set forth in the rules is both warranted and necessary to ensure that the IBT membership is well informed regarding its choice of candidates for both delegate and International Union office. In the context of the 1991 IBT election, the Second Circuit recognized the importance of access to employer premises for the purpose of campaigning "where no feasible alternative for campaigning by candidates for union office is available." Yellow Freight, 948 F.2d at 104. This Court agrees with the Election Officer that other methods of campaigning, including mailings, telephone campaigns, home visits, and alternative methods of face-to-face campaigning are woefully inadequate. Restricting candidates to those methods of campaigning will leave IBT members ill-informed regarding the choice of candidates in the 1995-96 IBT election. Thus, the proposed rule is crucial to the achievement of a free, fair, and democratic election process, and this Court's power to enforce the rule is firmly rooted in this Court's authority pursuant to the All Writs Act. Accordingly, the objection is overruled.
In sum, having reviewed the proposed rules that modify the 1991 IBT election rules, the Court finds these modifications to be well founded. Furthermore, this Court finds that the various objections to these proposed modifications are without merit. This Court approves and adopts the third group of proposed election rules, i.e., those that modify the election rules adopted during the 1991 IBT election and that are the subject of an objection.

4. Additional Objections
Several objections to the proposed election rules concern proposed changes to the rules that the Election Officer rejected during the rules-promulgation process. Each of these is discussed in turn.

*1368 a. Formula for Allocation of Convention Delegates Among Local Unions As Applied to Local Unions Comprised of a Substantial Number of Seasonal-Food-Industry Employees

IBT Local 890 objects to the formula set forth in the IBT Constitution for allocating the number of IBT Convention delegates to be elected by each Local Union. Article VII, Section 5 of the IBT Constitution provides, in relevant part:
The General Secretary-Treasurer shall determine the number of delegates which a Local Union may be entitled to send to the Convention by averaging the per capita tax paid on members by said Local Union for a two-year period ending six (6) months prior to the first day of the month in which the Convention is convened....
In essence, the number of delegates from each Local Union is based on the number of dues-paying members in that Local Union. The number of dues-paying members in a Local Union is determined by dividing the average dues paid by all the members from that Local Union over a two-year period by what a single, full-year employee would pay in dues during that period. Local 890 objects to the application of this formula to Local Unions with a substantial number of members employed in the seasonal food industry. Such members are employed seasonally and are, therefore, temporarily laid off by the food industry during part of each year. In Local Unions comprised of a substantial number of employees in the seasonal food industry, such as Local 890, the average number of dues-paying members as calculated by the above-mentioned formula tends to be lower than the actual number of members.
The proposed rules recognize that members who have been temporarily laid off due to their employment in the seasonal food industry have a right to vote for convention delegates and International Union officers, even though these members' dues may not have been paid through the month prior to balloting. Nevertheless, under the formula for delegate representation set forth in the IBT Constitution, members in Local Unions are, in effect, only awarded delegate representation in proportion to the number of months per year that they work and pay dues. Thus, for example, Local 890 reports that in the 1991 IBT election, although its members numbered approximately 12,000, its delegate allocation was based on an average of 7,000 dues-paying members. As a result, members from Local Unions comprised of a substantial number of employees in the seasonal food industry typically are represented by fewer delegates as compared to members in other Local Unions.
Local 890 contends that the formula for calculating the number of Convention delegates from each Local Union violates the LMRDA. Local 890 argues that the election provisions of the LMRDA are "firmly grounded on the `one-member, one vote' principle, and thereby implicitly reject[] any arrangement for nominating and voting in union elections that dilutes the value of any one member's vote." (Memorandum of Teamsters Local 890 in Response to Application for Approval of Election Rules ("Memorandum of Teamsters Local 890") at 6.) In support of this contention, Local 890 points to 29 U.S.C. § 411(a)(1), which provides that "[e]very member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, [and] to vote in elections," and to 29 U.S.C. § 481(e), which provides that "[e]ach member in good standing shall be entitled to one vote."
Local 890 proposes an election rule that allocates Convention delegate representation to Local Unions with a substantial number of members employed in the seasonal food industry on the basis of the actual number of members in each Local Union, rather than the average number of dues-paying members.
Although Local 890 has styled this argument as an objection to the proposed rules for the 1995-96 IBT election, in fact, Local 890 objects to the IBT Constitution, not the proposed election rules. Indeed, Local 890 concedes that "[t]he number of delegates a seasonal Local is permitted to have at the IBT convention ... is not expressly addressed in the proposed Rules, and thus is subject to the averaging formula provided in Article VII, Section 5 of the IBT Constitution." (Memorandum of Teamsters Local *1369 890 at 3.) Nevertheless, Local 890 urges this Court to modify the proposed election rules to include a provision that would, in effect, contradict the IBT Constitution.
Local 890 has failed to demonstrate, however, that the formula for allocating Convention delegates among Local Unions violates labor laws or otherwise hinders the Consent Decree's goals. This Court agrees with the Election Officer that "[w]hile it might be reasonable or necessary to require modification of a clause in the International Constitution which is patently illegal or which stands as a significant obstacle to the fulfillment of the goals of the Consent Decree, there is no good reason to arbitrarily interfere with the operation of the Union." (Election Officer's Reply Memorandum at 36.) Although Local 890 cites several provisions of the LMRDA regarding a union member's right to vote in union elections, these provisions do not prohibit the union representation structure found in the IBT Constitution. Moreover, the Election Officer has cited a Department of Labor regulation that recognizes the right of a union to establish its own structure for delegate representation during elections:
When officers of a national, international or intermediate labor organization are elected at a convention of delegates who have been chosen by secret ballot, the structure of representation of the membership is a matter for the union to determine in accordance with its constitution and by-laws. There is no indication that Congress intended, in enacting Title IV of the Act, to require representation in delegate bodies of labor organizations to reflect the proportionate number of members in each subordinate labor organization represented in such bodies. Questions of such proportionate representation are determined in accordance with the labor organization's constitution and bylaws insofar as they are not inconsistent with the election provisions of the Act.
29 C.F.R. § 452.127.
Not only is the formula set forth in the IBT Constitution for allocating Convention delegates among Local Unions permitted by law, but it is also consistent with the goals of the Consent Decree. Nothing in the Consent Decree prevents the IBT from choosing a delegate representation structure that allocates Convention delegates on the basis of each Local Union's average number of dues-paying members. Regardless of whether that delegate-representation structure is ultimately the fairest, it is not contrary to the Consent Decree. Hence, neither labor law nor the Consent Decree provides a basis for an election rule that would override the IBT Constitution's formula for allocating Convention delegates among Local Unions.
Local 890 also argues that because an overwhelming number of Teamsters employed in the seasonal food industry in California are female and hispanic, the formula constitutes institutional race, sex, and national origin discrimination because it denies those Union members sufficient Convention delegate representation. Local 890 cites Usery v. Stove, Furnace & Allied Appliance Workers International Union, 547 F.2d 1043 (8th Cir.1977), and Donovan v. Local 719, United Automobile, Aerospace and Agricultural Implement Workers of America, 561 F.Supp. 54 (N.D.Ill.1982), for the proposition that under the LMRDA, the absence of a deliberate intent to discriminate on the basis of race, sex, or national origin is not a defense against a challenge to election results on the ground of alleged discrimination. Furthermore, Local 890 notes that by far the largest group of Teamsters employed in the seasonal food industry is located in California and that California Government Code, section 12940(b) bars discrimination on the basis of sex, race, and national origin with respect to "the election of officers of [a] labor organization."
Any allegation of race or gender-based discrimination is a serious matter. When that allegation is levelled at a labor union, especially one that continues to refer to itself as a "Brotherhood," Justice pricks its ears. In fact, it may be time for the Union to cease using the anachronism "Brotherhood" and consider changing its name to reflect the increasing participation of women in the Union. Invidious discrimination of any kind, in any form, and under any guise is evil. It is unconscionable; it is dehumanizing; it is degrading; *1370 it is destructive; it is divisive; it is virulent; it is intolerable; it is abhorrent; and it must not be ignored or condoned. Invidious discrimination is one of society's worst enemies because it undermines society's moral foundation. In essence, it is a crime against humanity. Every conceivable legitimate means should be used to root it out.
Unfortunately, however, the Consent Decree is not a panacea. Under the Consent Decree, this Court only has authority and jurisdiction to rid the IBT of the influence of organized crime. Local 890's claim that the IBT Constitution discriminates against women and hispanics, while raising an issue of great concern to this Court, does not constitute a claim that the IBT Constitution is inconsistent with the Consent Decree. The Consent Decree is designed to remedy the problem of organized crime's influence over the Union, not the alleged problem of raceor gender-based discrimination in the Union. The Consent Decree is not an open sesame for modification of the IBT Constitution.
Moreover, Local 890's proposed modification of the election rules is not an appropriate vehicle for addressing the claim that a provision of the IBT Constitution discriminates against women and hispanics. Local 890 concedes that the offending provision is contained not in the proposed election rules, but rather in the IBT Constitution. Modifying the 1995-96 IBT election rules to eliminate the purportedly discriminatory provision of the IBT Constitution would only resolve Local 890's claim in the context of the 1995-96 IBT election and would leave the offending provision intact for all future elections. In addition, resolution of Local 890's discrimination claim would require extensive evidentiary hearings on issues not relevant to the administration of the Consent Decree in order to assess the factual basis for that claim. Thus, Local 890's claim that the IBT Constitution discriminates against women and hispanics is not properly the subject of this proceeding.
Accordingly, the objection is overruled.

b. Eligibility To Vote: The Requirement that Employers Deduct Union Dues
The proposed rules allow members to vote in the 1995-96 IBT election as long as their employer deducts their Union dues from their wages, even if the employer has delayed payment of those dues to the Local Union or defaulted on such payments. IBT Local 1150 objects to this proposed rule on the ground that, read strictly, it implies that a member will be disqualified from voting if his employer fails, whether inadvertently or deliberately, to deduct union dues from his wages. In other words, Local 1150 reads the proposed rule to allow a member to vote if his employer has deducted his dues from his wages but failed to remit those dues to the Local Union, but also reads the rule to disqualify a member from voting if his employer simply fails to deduct any union dues at all. Local 1150 urges this Court to modify the proposed rules so that eligibility to vote would depend not on whether a member's employer actually deducts dues from that member's wages, but rather on whether the member was paid wages from which dues should have been deducted. Local 1150 argues that, otherwise, an employer's failure to deduct Union dues will prevent a member from voting, through no fault of that member.
Local 1150's proposed modification is unnecessary, however, because the proposed rules, in conjunction with the IBT Constitution, adequately address this contingency. Article X, Section 5(c) of the IBT Constitution provides that "a member on dues checkoff whose employer fails to make a proper deduction during any month in which the member has earnings from which the dues could have been deducted, shall not lose good standing status for that month." The Election Officer notes that this provision applies to a member's right to vote. (Election Officer's Reply Memorandum at 20.) Moreover, this provision of the IBT Constitution is referenced in Article VI, Section 1(b) of the proposed rules, which includes among those eligible to vote:
Under and in accordance with Article X, Section 5(c) of the IBT Constitution, each member otherwise in good standing whose *1371 dues record does not reflect that his/her dues have been paid through the month prior to the month in which ballots are counted, who pays his/her dues by checkoff, and whose employer has remitted dues from him/her in the last remittance made by such employer, provided that such remittance was received within ninety (90) days of the date on which the ballots are counted....
Because the proposed rules adequately address the concern raised by Local 1150, the objection is overruled.

c. Ballots Marked for Both a Slate of Candidates and an Inconsistent Individual Candidate
IBT Local 1150 also objects to Article III, Section 4(g) of the proposed rules, which provides that in the event that a voter marks a ballot for both a slate of candidates and an inconsistent individual candidate, the ballot is counted as a vote for the slate of candidates and the marking for the individual candidate is disregarded. This proposed rule also applied during the 1991 IBT election. Local 1150 contends that the rule is inconsistent with federal law, which requires that a ballot be counted in accordance with the intent of the voter, and argues that markings for individual candidates should take precedence over a marking for a slate of candidates.
While it is true that courts have required that ballots be counted in accordance with the intent of the voter, Local 1150 has failed to demonstrate that giving a marking for a slate of candidates precedence over markings for inconsistent individual candidates is contrary to the voter's intent. Local 1150 argues that "[a] mark placed next to the name of an individual candidate plainly indicates the voter's deliberate and considered decision to vote for that individual." (Memorandum of Teamsters Local 1150 in Response to Election Officer's Application No. 1 ("Memorandum of Teamsters Local 1150") at 8.) One might argue with equal force, however, that a mark placed next to a slate of candidates plainly indicates the voter's deliberate and considered decision to vote for that slate. The problem addressed by the proposed rule only arises, after all, when the markings on a particular ballot cannot be interpreted consistently. Thus, the preference given in the proposed rules to the marking for a slate of candidates is a reasonable interpretation of the voter's intent. Moreover, this rule applied during the 1991 IBT election and, therefore, the IBT membership is already accustomed to this rule. Adopting an opposing rule for which there is no more reasonable justification would simply create undue confusion. Accordingly, the objection is overruled.

d. Verification of the Computer Program Used to Count Ballots
IBT Local 1150 urges this Court to amend the proposed rules to afford candidates the opportunity to verify the accuracy of the computer program codes used in the counting of ballots in the election. Specifically, Local 1150 argues that (1) candidates should be permitted to have a competent expert review the computer program codes to verify their accuracy, and (2) the computerized vote count should be subject to verification by a hand count of the ballots from a statistically significant number of randomly selected locals after the computer count has been completed.
Local 1150's concern over the accuracy of the computer program codes is based not on any specific complaint regarding the computer program codes employed by the Election Officer but rather on a more general skepticism regarding the accuracy of vote-counting computer program codes. While this concern is understandable, Local 1150's proposed remedy is cumbersome and involves unwarranted security risks. To amend the rules to afford every candidate the right to have his or her expert examine the computer program codes before any specific protest regarding the accuracy of those codes has arisen would implement an inefficient means of verifying the accuracy of the computer program codes. In addition, the Government points out that affording candidates such access would compromise the security of the computer program codes and increase the risk of tampering. (Government's Response Memorandum at 40.)
*1372 If, during the election process, a protest arises concerning the accuracy or integrity of the computer program codes, steps may be taken to verify the accuracy of the computerized vote count in question. In the appropriate circumstance, for example, this Court could appoint its own expert for such a purpose, or otherwise require the Election Officer to verify the election results. Similarly, a hand-count verification of the election results is a remedy more appropriately implemented by the Election Officer or this Court in response to a specific protest regarding the accuracy of the election results. Accordingly, the objection is overruled.

e. Interested Parties' Access to Decisions of the Election Officer and the Election Appeals Master and to Court Documents
The proposed rules provide that copies of decisions on protests issued by the Election Officer or the Election Appeals Master shall be sent to (1) the complainant, (2) the Local Union involved, (3) any candidate adversely affected by the decision, and (4) any person or entity that is the subject of the decision. IBT Local 1150 urges this Court to expand the rules to require the Election Officer and the Election Appeals Master to send copies of their decisions to "interested members and affected affiliates." (Memorandum of Teamsters Local 1150 at 14.) In addition, Local 1150 urges the Court to adopt a rule whereby interested members and affiliates are sent copies of IBT election-related documents filed with this Court.
With regard to decisions of the Election Officer and the Election Appeals Master, the Court finds that the proposed rules set forth an adequate and complete list of the individuals and entities to which copies of those documents automatically should be sent. Clearly, decisions of the Election Officer and the Election Appeals Master are public documents, and copies of these documents should be made available to any Teamster upon request. Indeed, the Election Officer represents that she is devising procedures for handling such requests. (Election Officer's Reply Memorandum at 28.) Adopting a rule that would require the Election Officer automatically to send copies of decisions to all "interested parties and affected affiliates," however, would be unduly burdensome and unjustifiably expensive.
Similarly, a requirement that the Election Officer automatically send copies of all election-related filings with this Court to all interested parties and affected affiliates would also be unduly burdensome and unjustifiably expensive. Accordingly, the objection is overruled.

f. Proposed Signature Requirement for Ballot Envelopes
IBT Local 1150 urges this Court to modify the proposed rules to require each member, during both the delegate elections and the elections for International Union office, to sign the outside of the envelope in which that member returns his ballot. The purpose of this proposal is to provide an additional means of voter verification during the balloting process. Local 1150 argues that without such a signature requirement, anyone who comes into possession of an unmarked or unsealed ballot can mark and return the ballot.
Neither the 1991 IBT election rules nor the proposed election rules for the 1995-96 IBT election have included such a requirement. Under the proposed rules, ballots are sent with prelabeled envelopes containing the member's name, address, and other identifying information. Ballots lacking the correct information on the return envelope will be considered void. In addition, ballots and return envelopes both contain markings to distinguish them from fraudulent ballots.
The Election Officer argues that an additional requirement of a signature on the exterior of the ballot envelope is not a particularly effective security measure because verification of the signature is itself a burdensome and expensive process. (Election Officer's Reply Memorandum at 32-33.) More importantly, adding an additional requirement to the balloting procedures presents the voter with one more hoop through which to jump before his vote may be counted. As the Election Officer notes, "[m]aking the voting process more complicated insures that some portion of the voters will mistakenly fail to *1373 comply with a new written instruction to sign the envelope and thus will have their otherwise legitimate votes invalidated." Id. at 33.
This Court agrees with the Election Officer that "ballot security rules should be carefully scrutinized to ensure that their potential for invalidating participation does not outweigh their value in assuring procedural integrity." Id. In view of the relatively minor increase in security afforded by a requirement that each voter sign the exterior of the ballot envelope, the benefits of such a requirement are clearly outweighed by the potential for invalidating otherwise legitimate ballots that would be created by such a requirement. Accordingly, the objection is overruled.
In sum, having reviewed the additional objections to the proposed election rules and having found them to be meritless, these objections are overruled.

III. Conclusion
For the reasons discussed above, it is hereby ordered that Election Officer Application I is granted and the proposed election rules for the 1995-96 IBT election, as amended in Appendix A to the Election Officer's Reply Memorandum, are adopted in their entirety.
It is further ordered that all subordinate entities of the International Brotherhood of Teamsters, including all locals and joint councils, are hereby bound by these election rules, effective immediately.
It is further ordered that these rules shall be enforceable upon pain of contempt.
SO ORDERED.
NOTES
[1] The proposed rule as amended appears as Appendix A to the Election Officer's Reply Memorandum.