Jack B. Weinstein
United States District Judge

SO ORDERED.

UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, the Commission of La Cosa Nostra, Anthony Salerno, a/k/a "Fat Tony," Matthew Ianniello, a/k/a "Matty the Horse," Anthony Provenzano, a/k/a "Tony Pro," Nunzio Provenzano, a/k/a "Nunzi Pro," Anthony Corallo, a/k/a "Tony Ducks," Salvatore Santoro, a/k/a "Tom Mix," Christopher Furnari, Sr., a/k/a "Christie Tick," Frank Manzo, Carmine Persico, a/k/a "Junior," "The Snake," Gennaro Langella, a/k/a "Gerry Lang," Philip Rastelli, a/k/a "Rusty," Nicholas Marangello, a/k/a "Nicky Glasses," Joseph Massino, a/k/a "Joey Messina," Anthony Ficarotta, a/k/a "Figgy," Eugene Boffa, Sr., Francis Sheeran, Milton Rockman, a/k/a "Maishe," John Tronolone, a/k/a "Peanuts," Joseph John Aiuppa, a/k/a "Joey O'Brien," "Joe Doves," "Joey Aiuppa," John Phillip Cerone, a/k/a "Jackie the Lackie," "Jackie Cerone," Joseph Lombardo, a/k/a "Joey the Clown," Angelo Lapietra, a/k/a "The Nutcracker," Frank Balistrieri, a/k/a "Mr. B," Carl Angelo Deluna, a/k/a "Toughy," Carl Civella, a/k/a "Corky," Anthony Thomas Civella, a/k/a "Tony Ripe," General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Jackie Presser, General President, Weldon Mathis, General Secretary–Treasurer, Joseph Trero-

tola, a/k/a "Joe T," First Vice President, Robert Holmes, Sr., Second Vice President, William J. McCarthy, Third Vice President, Joseph W. Morgan, Fourth Vice President, Edward M. Lawson, Fifth Vice President, Arnold Weinmeister, Sixth Vice President, John H. Cleveland, Seventh Vice President, Maurice R. Schurr, Eighth Vice President, Donald Peters, Ninth Vice President, Walter J. Shea, Tenth Vice President, Harold Friedman, Eleventh Vice President, Jack D. Cox, Twelfth Vice President, Don L. West, Thirteenth Vice President, Michael J. Riley, Fourteenth Vice President, Theodore Cozza, Fifteenth Vice President, Daniel Ligurotis, Sixteenth Vice President, Salvatore Provenzano, a/k/a "Sammy Pro," Former Vice President, Defendants.

In re APPLICATION LXXXVI OF the INDEPENDENT ADMINISTRATOR.

No. 88 Civ. 4486 (DNE).

United States District Court, S.D. New York.

Sept. 15, 1992.

See also, 816 F.Supp. 852 and 816 F.Supp. 864.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Steven C. Bennett, Asst. U.S. Atty., of counsel), for United States.

Cohen, Weiss & Simon, New York City (Richard N. Gilberg, Richard M. Seltzer, of counsel), for Intern. Broth. of Teamsters.

Frederick B. Lacey, Independent Adm'r of the Intern. Broth. of Teamsters.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provides for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court–Appointed Officers"). The election, which the Election Officer certified on January 22, 1992, resulted in Ronald C. Carey assuming the office of IBT General President. The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime

through the electoral and disciplinary provisions.

Application LXXXVI involves a dispute over the Independent Administrator's authority to review the General President's decisions concerning the imposition of temporary trusteeships and the appointment of temporary trustees. Earlier this year, General President Carey placed IBT Local 282, located in Lake Success, New York, under trusteeship without notifying the Independent Administrator. Upon learning of Mr. Carey's action, the Independent Administrator requested certain information relating to the trusteeship decision [1] and the opportunity to review Mr. Carey's selection of temporary trustee. The IBT resisted this request and disputed the Independent Administrator's authority in the trusteeship area. Subsequent correspondence between the Independent Administrator and the IBT's General Counsel, Mr. Richard N. Gilberg of Cohen, Weiss & Simon, revealed that the IBT interpreted the Consent Decree in a way that did not vest the Independent Administrator with authority to review IBT trusteeship decisions. While the IBT has agreed to provide the Independent Administrator with the requested information "as a courtesy," it contests his authority to review Mr. Carey's trusteeship decisions. In this application, the Independent Administrator seeks an order confirming his authority to review General President Carey's appointments of temporary trustees and the imposition of trusteeships. For the reasons stated below, this Court grants the Independent Administrator's application.

### Discussion

#### A. The Independent Administrator's Application Is Ripe for Decision

■ The IBT contends that the Independent Administrator's application is not ripe because, as a courtesy, it has agreed to provide the Independent Administrator with information surrounding trusteeship decisions. In addition, the IBT avers that no dispute currently exists over IBT decisions concern-

---

1. This information includes: (1) copies of all material reviewed by the IBT in reaching the decision to impose a trusteeship over Local 282; (2) at least ten-day notice before taking any ac-

tion concerning the Local 282 trusteeship; and (3) periodic status reports on Local 282, including all actions taken by the temporary trustee.

ing the appointment of temporary trustees or the imposition of trusteeships. Section K.16 of the Consent Decree provides that "[t]his Court shall retain jurisdiction to supervise the activities of the [Independent] Administrator and to entertain any future applications by the [Independent] Administrator or the parties." The power of the Independent Administrator to bring an application before this Court is well settled. Section K.16 of the Consent Decree permits an application based upon any issue—including a prospective matter—that touches upon a provision of the Consent Decree. Indeed, this Court has held that "[t]he scope of [Section] K.16 is broad enough to warrant the court to consider prospective matters that may threaten the letter, spirit and intent of this Decree." May 6, 1991 Opinion & Order, 764 F.Supp. 787, 791 (S.D.N.Y.), aff'd, 940 F.2d 648 (2d Cir.), cert. denied, — U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991). The instant application concerns the Independent Administrator's power to review IBT trusteeship decisions, which is a task directly related to the goal of eradicating corruption from the Union. Moreover, resolution of the application requires an interpretation of several sections of the Consent Decree, including Sections B.3 and F.12. Because the Independent Administrator seeks to address an issue that implicates the language and goals of the parties' agreement, this application is a proper exercise of his authority under Section K.16 of the Consent Decree.

## B. The Independent Administrator Has Authority to Review the IBT's Appointment of Temporary Trustees and the Imposition of Trusteeships

### 1. Consent Decree Law

■ It is well settled that "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *see Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 38 (2d Cir.1989). In interpreting a consent decree, it is proper to consider certain aids to construction, such as the circumstances surrounding the formation of the consent order, any technical meaning the parties accorded to certain words, and any other documents expressly incorporated in the decree. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975). The Supreme Court has held that

[w]here parties in one agreement include both a consent order and *an explanation of the order*, and also provide that the complaint is to be used to construe the order, it seems logical to conclude that, at least as to interpretations not precluded by the words of the order itself, the collateral documents can and should be used to give meaning to the words of the order.

*Id.* at 239 n. 12, 95 S.Ct. at 935 n. 12 (emphasis added).

■ Several provisions of the Consent Decree provide an explanation of that document. The IBT recognized that "there have been allegations, sworn testimony and judicial findings of past problems with La Cosa Nostra corruption of various elements of the IBT." Consent Decree, at p. 2 (fourth Whereas Clause). As a result, the parties expressly agreed that "there should be no criminal element or La Cosa Nostra corruption of any part of the IBT." *Id.* (fifth Whereas clause). In addition, the parties agreed that "it is imperative that the IBT, as the largest trade union in the free world, be maintained democratically, with integrity and for the sole benefit of its members without unlawful outside influence." *Id.* (sixth Whereas clause). As this Court previously noted, these purposes "animat[e] any reasonable interpretation of the Consent Decree:" an interpretation of the parties' agreement is reasonable only if it comports with these goals and promotes their ultimate attainment. August 19 Opinion & Order, slip op. at p. 35 (S.D.N.Y.1992).

### 2. Relevant Provisions of the Consent Decree

The Independent Administrator's authority to review IBT trusteeship decisions derives from the "four corners" of the Consent Decree. In fact, resolution of this matter is possible from an analysis of three provisions

of the parties' agreement, as well as from the Consent Decree's express purposes. Section B.3(3) provides that the Independent Administrator's authority under Sections F.12 and H.13 "shall terminate not later than nine (9) months after the certification of the 1991 election results." The phrase "certification of the 1991 election results" is a term of art in the Consent Decree, referring to the earlier of the actual certification of the election results or one month following the final balloting. The Election Officer certified the election results on January 22, 1992 and the final balloting occurred on December 10, 1991. Accordingly, "certification of the 1991 election results" occurred on January 10, 1992. The Independent Administrator's authority, therefore, terminates on October 10, 1992.

Section F.12(A) vests the Independent Administrator with the "same rights and powers as the IBT's General President and/or General Executive Board under the IBT Constitution" and applicable law, including "appointing temporary trustees to run the affairs of any ... affiliated entities." In addition, this Section permits the Investigations Officer to institute trusteeship proceedings following notice to the General President. The General President, however, has ten days after such notice to institute trusteeship proceedings on his or her own initiative. Should the General President decide to take action, his or her conduct is subject to review by the Investigations Officer and the Independent Administrator. Thus, Section F.12(A) allows the Independent Administrator to impose trusteeships and to review the actions of the General President concerning trusteeship decisions that follow referral from the Investigations Officer.

Finally, Section F.12(B) authorizes the Independent Administrator to veto various IBT actions that the Independent Administrator reasonably believes constitute an act of racketeering pursuant to 18 U.S.C. § 1961, including the appointment of a trustee, "until the certification of the IBT elections to be conducted in 1991."

The IBT does not dispute the power of the Independent Administrator, under Section F.12(A), to appoint temporary trustees and

to review IBT trusteeship decisions that originate from prodding by the Investigations Officer. (IBT's Memorandum of Law in Opposition to Application LXXXVI of the Independent Administrator, at pp. 4, 6). The IBT also acknowledges that under Section B.3(3), the Independent Administrator's power under Section F.12(A) extends until October 10, 1992. *See id.* The IBT avers, however, that the Local 282 matter implicates Section F.12(B) of the Consent Decree because the General President, on his own initiative, placed the Local under trusteeship. The IBT contends that the Independent Administrator's power to review IBT action under Section F.12(B), including the appointment of a temporary trustee, lapsed upon the certification of the 1991 election, or January 10, 1992. The IBT asserts that Mr. Carey's decision is therefore beyond the scope of the Independent Administrator's review authority under Section F.12(B) and any other provision of the Consent Decree.

3. *These Provisions Reveal that the Independent Administrator Has Authority to Review IBT Trusteeship Decisions*

The IBT's reliance on Section F.12(B) is misplaced. Section B.3(3) vests the Independent Administrator with authority to exercise his powers under Section F.12 until October 10, 1992. The Independent Administrator's power to review IBT appointments, such as the naming of temporary trustees, is found in Section F.12(B), which is within the purview of Section B.3(3). Thus, the Independent Administrator may review IBT trusteeship decisions until October 10, 1992.

The IBT nevertheless claims that Section B.3(3) does not apply to Section F.12(B), which provides that the Independent Administrator's review power extends only to the date of the "certification of the IBT elections to be conducted in 1991," or January 10, 1992. Admittedly, Section F.12(B) contains a shorter duration provision than that found in Section B.3(3). Resolution of this inconsistency is possible from an analysis of the Consent Decree. This Court has held that in resolving Consent Decree matters, "[t]he spirit ... of this Consent Decree command[s] that its specific language be given the most reasonable interpretation possible." October

18, 1989 Opinion & Order, 723 F.Supp. 203, 210 (S.D.N.Y.1989), *aff'd*, 931 F.2d 177 (2d Cir.1991); *see, e.g., SEC v. Levine*, 881 F.2d 1165, 1179 (2d Cir.1989); *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 38 (2d Cir.1989). A reasonable interpretation of the Consent Decree is one that comports with and furthers the purpose of the parties' agreement, which in part is to rid the IBT of La Cosa Nostra influence and corruption, and to maintain the IBT "democratically, with integrity and for the sole benefit of its members." Consent Decree, at p. 2 (fifth & sixth Whereas clauses); *see* August 19, 1992 Opinion & Order, slip op. at p. 35 (S.D.N.Y.1992).

Trusteeship matters often involve instances of corruption at the local union level. *See, e.g.*, IBT Constitution, Art. VI, § 5(a) (General President may institute trusteeship proceedings where "such action is necessary for the purpose of correcting corruption"). It follows, then, that the IBT's conduct in connection with trusteeship proceedings necessarily implicates a goal of the Consent Decree. Granting the Independent Administrator an active role in trusteeship matters, in this case by allowing him to continue to review IBT efforts in this sphere of activity, can only help to ensure the prompt eradication of union corruption. For instance, in a case where the Independent Administrator had appointed a temporary trustee on his own initiative, General President Carey subsequently attempted to replace that trustee with William F. Genoese, a New York Local IBT officer. Following a review of Mr. Genoese's qualifications for the position, however, the Independent Administrator vetoed Mr. Genoese's appointment. The Independent Administrator found that "[n]ot only does Mr. Genoese have no experience in ridding Locals of crime and corruption," but he suffers from a "sad record of inaction in the face of a long history of corruption at [JFK] Airport and the IBT Locals affiliated with the airport, at a time when Mr. Genoese was serving as the Director of the IBT Airline Division." *See* Letter from Frederick B. Lacey, Independent Administrator, to Richard N. Gilberg, General Counsel to the IBT, at p. 13 (May 27, 1992) (on file in the Southern District of New York). In addition, the Independent Administrator found that Mr. Genoese was "unbelievably oblivious to the allegations of corruption around him." *Id.* at 14.

As this illustration demonstrates, continued Independent Administrator review of IBT action, under Section F.12(B), directly advances the express goal of the Consent Decree to rid the IBT of organized crime influence and corruption. Interpreting the Consent Decree in light of this express purpose naturally leads to a finding that the Independent Administrator's review power under Section F.12(B) shall be governed by the duration provision contained in Section B.3(3), and thus will extend until October 10, 1992.

The IBT's interpretation of Section B.3(3) is nonsensical. Recognizing a need to resolve the conflict between Sections B.3(3) and F.12(B), counsel for the IBT attempts a reconciliation by engaging in a tortured construction of the Consent Decree. It claims that the two sections, though apparently in conflict, actually address different areas of the Independent Administrator's authority, and thus, are consistent. The IBT avers that Section B.3(3) refers not to the duration of the Independent Administrator's authority under Sections F.12 and H.13, but only to the duration of the Independent Administrator's authority in relation to the Independent Review Board (the "IRB") in the nine months following certification of the 1991 elections. The IBT fails to enumerate the Independent Administrator's powers that relate only to the IRB. Nevertheless, it still contends that the duration provision of Section F.12(B) is unrelated to the duration provisions of Section B.3(3).

Such an interpretation is wholly without merit. Section B.3(3) provides that "the role and authority provided for in paragraphs 12 and 13 of this Order regarding the ... Administrator and [his] relationship with the Independent Review Board shall terminate not later than nine months after the certification of the 1991 election results." This Section plainly permits the Independent Administrator to continue exercising authority under Sections F.12 and H.13 of the Consent Decree until October 10, 1992. By its express terms, this involves his review power

30

under Section F.12(B). Therefore, the time provisions found in Section F.12(B) and B.3(3) clearly conflict with each other.

The reference in Section B.3(3) to interaction with the IRB is not a limitation on the continued exercise of the Independent Administrator's power pursuant to Sections F.12 and H.13, but rather a recognition of the fact that he may refer such matters directly to the IRB. Section G(m) provides that "the Administrator shall continue to exercise the investigatory and disciplinary authority for the limited period set forth in [Section B.3(3)] above provided, however, that the ... Administrator may, instead, refer any such investigatory matter to the Independent Review Board." The reference in Section B.3(3) to the IRB simply acknowledges the existence of this option. The IBT's attempted reconciliation of the two provisions suggests a desire to engage in tortured and specious constructions of the Consent Decree if necessary to achieve a desired end.

Moreover, adopting the longer time frame contained in Section B.3(3) is consistent with the Independent Administrator's broad authority over trusteeships. *See, e.g.,* July 3, 1991 Memorandum & Order, slip op. (S.D.N.Y.1991). Under Section F.12(A), the Independent Administrator has authority until October 10, 1992 to institute temporary trusteeships, to review IBT trusteeship decisions that stem from action by the Investigations Officer, and to review GEB decisions concerning trusteeship proceedings. In addition to this wide-ranging authority under Section F.12(A), the Independent Administrator also has the power under Section F.12(B) to review IBT trusteeship decisions. While Section F.12(B)'s duration provision conflicts with the October 10, 1992 date contained in Section B.3(3), adhering to the longer duration clause contained in Section B.3(3) is consistent with the Independent Administrator's broad authority in trusteeship matters. Indeed, the IBT offers no reasonable basis for limiting the Independent Administrator's broad power over trusteeship matters by adopting Section F.12(B)'s restrictive duration provision.

*Conclusion*

Like the other Court–Appointed Officers, the Independent Administrator has worked to realize an express purpose of the Consent Decree—to eliminate corruption from the IBT. "While eliminating entrenched corruption, [he] also [has] acted as a constant check on any individual or entity that desired to use the IBT as a vehicle for lawlessness, as so many had done successfully in the past." August 19, 1992 Opinion & Order, slip op. at p. 40 (S.D.N.Y.1992). A reasonable interpretation of the Consent Decree is one that permits the Independent Administrator to continue performing this task. Resolving the conflict between Sections B.3(3) and F.12(B) by adopting the longer time provision of Section B.3(3) allows the Independent Administrator to review IBT trusteeship decisions until October 10, 1992. This facilitates the Independent Administrator's ability to root out corrupt influences that inevitably impair the interests of the Union's general membership. An interpretation that produces such an effect is not only consistent with the express purposes of the Consent Decree, it also affirmatively fosters an environment hospitable to the attainment of the document's goals.

IT IS HEREBY ORDERED that the IBT's objections to the Independent Administrator's application are without merit;

IT IS FURTHER ORDERED that the Independent Administrator's application is granted in its entirety.

SO ORDERED.