UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION II OF the ELECTION OFFICER.

No. 88 Civ. 4486 (DNE).

United States District Court, S.D. New York.

Oct. 17, 1995.

Mary Jo White, United States Attorney for the Southern District of New York (Karen B. Konigsberg, Assistant United States Attorneys, of counsel), for the United States.

Judith A. Scott, General Counsel, International Brotherhood of Teamsters, Washington, DC, for defendant.

Barbara Zack Quindel, Washington, DC, for Election Officer.

## OPINION & ORDER

EDELSTEIN, District Judge.

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America ("the Government") against, *inter alia*, defendants International Brotherhood of Teamsters ("the IBT" or "the Union") and the IBT's General Executive Board. This settlement is embodied in the voluntary consent order entered on March 14, 1989 ("the Consent Decree"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through a two-phased implementation of the Consent Decree's various remedial provisions. In the first phase of the Consent Decree, these provisions established offices for three Court-appointed officials: the Independent Administrator to oversee the Consent Decree's provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to supervise the electoral process that led up to and included the 1991 election for International Union Office. In the second phase of the Consent Decree, the Independent Administrator was replaced by a three-member Independent Review Board ("the IRB"). Fur-

ther, paragraph 12(D)(ix) of the Consent Decree provides that "the union defendants consent to the Election Officer, at Government expense, to supervise the 1996 IBT Elections."

■ In the instant application, the 1996 IBT Election Officer, Barbara Zack Quindel, ("the Election Officer") apprises the Court of a funding problem that she describes as a "crisis that could jeopardize my ability to properly discharge my duties as Election Officer." Letter from Barbara Zack Quindel, Election Officer for the International Brotherhood of Teamsters, to the Honorable David N. Edelstein, United States District Judge ("Election Officer's Letter") at 1 (October 13, 1995) (on file with Clerk of Southern District of New York).[1] The Election Officer asserts that the Justice Department has informed her that the Government only can provide interim funding of approximately $200,000 to fund the Election Officer's activities between now and November 13, 1995. *Id.* The Election Officer claims that her office requires $1,086,000 during this time period.

She further asserts that although the Justice Department is aware of her office's financial needs, pursuant to current appropriations legislation, the Justice Department can only allocate interim funding of approximately $200,000. The Election Officer contends that this funding deficiency has been caused by the fact that the Congress has yet to pass a budget for the federal government for fiscal year 1996. Instead, Congress has passed a continuing resolution that funds 1996 Justice Department expenditures at 1995 levels until a budget has been passed. The Election Officer claims that interim funding based on 1995 levels is insufficient because the 1995 budget for the Election Office "reflected several months of planning and start-up, without a full election office and regional staff. In contrast, the [fiscal year 1996] budget covers the peak of election activity, including the delegate elections and the [IBT] Conven-

tion." *Id.* at 1–2. The Election Officer states that "[f]unding based on last year's budget is insufficient to cover the cost of the myriad tasks to be performed at this time and the staff and expenses that [the Election Office is] now incurring necessary to perform those tasks...." *Id.* at 2. As a result, the Election Officer submitted with her letter a proposed order, ordering the Justice Department to provide funding up to $6,000,000 for fiscal year 1996.

Neither the IBT nor the Government disputes the Election Officer's contentions. In a letter to this Court, the IBT states:

> The IBT has reviewed the submission of the Election Officer, Barbara Zack Quindel.... The IBT is in agreement with the proposed order [submitted by the Election Officer].

Letter from Judith A. Scott, General Counsel for International Brotherhood of Teamsters, to the Honorable David N. Edelstein, United States District Judge ("IBT Letter") at 1 (October 13, 1995) (on file with Clerk of Southern District of New York). Moreover, not only has the Government filed no papers in opposition to the Election Officer's letter, but in an October 12, 1995, letter to this Court, the Government apprised this Court of this funding problem. Letter from Karen B. Konigsberg, Assistant United States Attorney for the Southern District of New York, to the Honorable David N. Edelstein, United States District Judge ("Government's Letter") at 1 (October 12, 1995) (on file with Clerk of Southern District of New York). In this letter, the Government echoes the Election Officer's contention that "[u]nder the resolution, ... the Government cannot fund the Election Officer to the level provided in her budget." *Id.* at 1

## BACKGROUND

In the six and a half years that the Consent Decree has been in effect, the parties

---

**1.** Although the Election Officer styled the instant application as a letter to the Court, the Election Officer's letter, nonetheless, is deemed to be an application. *See* Black's Law Dictionary 526 (5th ed. 1983) (defining a motion as "[a]n application made to a court or judge for purpose of obtaining a rule or order directing some act to be

done in favor of the applicant"). The Election Officer's letter is deemed to be an application because it requests "that the Court issue an order that the government secure adequate funding for the work of the Election Office." Election Officer's Letter at 4.

have made substantial progress in achieving the Consent Decree's goal that "the IBT ... be maintained democratically for the sole benefit of its members and without unlawful outside influence." Consent Decree at 2. To further this goal, the Consent Decree provided for an Election Officer to oversee the 1991 IBT elections. Because of the work and vigilance of the 1991 Election Officer and his staff, the 1991 IBT elections were honest, democratic, fair, and free from the harassment, intimidation, coercion, hooliganism, and threats that were so much a part of the sordid and disreputable history of the IBT. In addition, the Consent Decree has been very effective at rooting out corruption within the IBT. During the first phase of the Consent Decree, the Investigations Officer brought numerous charges against IBT members, and the Independent Administrator conducted hearings on these charges.

Moreover, during the second phase of the Consent Decree, the IRB has continued this work—investigating charges of corruption, conducting hearings, and taking disciplinary action. As a result of the efforts of the Investigations Officer, the Independent Administrator, and the Independent Review Board, 73 IBT members have been suspended for misconduct, and 155 IBT members have resigned or been barred from the Union because they were corrupt.

Although great progress has been made in ridding the Union of the heinous influence of organized crime, there is much more work to be done before the Consent Decree's goals will be achieved. The democratic cleansing process must continue. Working to rid the IBT of the perverse influence of organized crime has been an arduous task that has spawned a Niagara of litigation.[2] Yet, as

---

2. *See* 899 F.2d 143 (2d Cir.1990); 905 F.2d 610 (2d Cir.1990); 907 F.2d 277 (2d Cir.1990); 931 F.2d 177 (2d Cir.1991); 941 F.2d 1292 (2d Cir. 1991), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); 948 F.2d 98 (2d Cir.1991), *vacated as moot,* — U.S. ——, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992); 948 F.2d 1338 (2d Cir.1991); 950 F.2d 94 (2d Cir.1991) (supplemental 2d Cir. Opinion, 968 F.2d 1472 (1992)); 954 F.2d 801 (2d Cir.1992), *cert. denied,* 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); 955 F.2d 171 (2d Cir.1992); 964 F.2d 180 (2d Cir.1992); 964 F.2d 1308 (2d Cir.1992); 968 F.2d 1506 (2d Cir.1992); 970 F.2d 1132 (2d Cir.1992); 978 F.2d 68 (2d Cir.1992); 981 F.2d 1362 (2d Cir.1992); 986 F.2d 15 (2d Cir.1993); 998 F.2d 120 (2d Cir.1993); 998 F.2d 1101 (2d Cir.1993); 3 F.3d 634 (2d Cir.1993); 12 F.3d 360 (2d Cir.1993); 14 F.3d 183 (2d Cir.1994); 19 F.3d 816 (2d Cir.1994); 697 F.Supp. 710 (S.D.N.Y.1988); 708 F.Supp. 1388 (S.D.N.Y. 1989); 723 F.Supp. 203 (S.D.N.Y.1989), *aff'd,* 931 F.2d 177 (2d Cir.1991); 725 F.Supp. 162 (S.D.N.Y.1989), *aff'd,* 905 F.2d 610 (2d Cir. 1990); 726 F.Supp. 943 (S.D.N.Y.1989), *modified,* 899 F.2d 143 (2d Cir.1990); 728 F.Supp. 920 (S.D.N.Y.1989); 728 F.Supp. 924 (S.D.N.Y. 1989); 728 F.Supp. 1032 (S.D.N.Y.1990), *aff'd,* 907 F.2d 277 (2d Cir.1990); 734 F.Supp. 626 (S.D.N.Y.1990); 735 F.Supp. 502 (S.D.N.Y. 1990), *aff'd,* 907 F.2d 277 (2d Cir.1990); 743 F.Supp. 155 (S.D.N.Y.1990), *aff'd,* 905 F.2d 610 (2d Cir.1990); 735 F.Supp. 519 (S.D.N.Y.1990); 740 F.Supp. 285 (S.D.N.Y.1990); 741 F.Supp. 491 (S.D.N.Y.1990); 742 F.Supp. 94 (S.D.N.Y. 1990), *aff'd as modified,* 931 F.2d 177 (2d Cir. 1991); 743 F.Supp. 155 (S.D.N.Y.1990); 745 F.Supp. 189 (S.D.N.Y.1990); 745 F.Supp. 908 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir. 1991), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); 750 F.Supp. 128 (S.D.N.Y.1990), *appeal dismissed,* No. 91–6210 (2d Cir. Jan. 8, 1992); 133 F.R.D. 99 (S.D.N.Y. 1990); 753 F.Supp. 1181 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir.1991), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992); 754 F.Supp. 333 (S.D.N.Y.1990); 134 F.R.D. 50 (S.D.N.Y.1991), *vacated and remanded,* 948 F.2d 1338 (2d Cir.1991); 761 F.Supp. 315 (S.D.N.Y.1991); 764 F.Supp. 787 (S.D.N.Y. 1991), *aff'd,* 940 F.2d 648 (2d Cir.), *cert. denied,* 502 U.S. 819, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); 764 F.Supp. 797 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir.1992); 764 F.Supp. 817 (S.D.N.Y.1991), *vacated and dismissed as moot,* 964 F.2d 171 (2d Cir.1992); 765 F.Supp. 1206 (S.D.N.Y.1991), *aff'd in part and rev'd in part,* 948 F.2d 1278 (2d Cir.1991); 138 F.R.D. 50 (S.D.N.Y.1991); 776 F.Supp. 144 (S.D.N.Y. 1991), *aff'd,* 954 F.2d 801 (2d Cir.), *cert. denied,* 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); 777 F.Supp. 1123 (S.D.N.Y.1991), *aff'd,* Nos. 92–6056, 6058, 6088 (2d Cir. Sept. 15, 1992); 777 F.Supp. 1127 (S.D.N.Y.1991); 777 F.Supp. 1130 (S.D.N.Y.1991), *aff'd,* 964 F.2d 1308 (2d Cir.1992); 777 F.Supp. 1133 (S.D.N.Y. 1991), *aff'd,* 970 F.2d 1132 (2d Cir.1992); 782 F.Supp. 238 (S.D.N.Y.1992), *aff'd,* Nos. 92–6056, 6058, 6088, 1993 WL 364502 (2d Cir. Sept. 15, 1992); 782 F.Supp. 243 (S.D.N.Y.1992); 782 F.Supp. 256 (S.D.N.Y.1992); 787 F.Supp. 345 (S.D.N.Y.1992), *aff'd,* 978 F.2d 68 (2d Cir.1992); 791 F.Supp. 421 (S.D.N.Y.1992); 792 F.Supp. 1346 (S.D.N.Y.1992), *aff'd,* 981 F.2d 1362 (2d Cir.1992); 803 F.Supp. 734 (S.D.N.Y.1992); 803 F.Supp. 740 (S.D.N.Y.1992); 803 F.Supp. 758 (S.D.N.Y.1992), *aff'd,* 990 F.2d 623 (2d Cir. 1993); 803 F.Supp. 761 (S.D.N.Y.1992), *aff'd in part and rev'd in part,* 998 F.2d 1101 (2d Cir. 1993); 803 F.Supp. 806 (S.D.N.Y.1992), *aff'd,* 12 F.3d 360 (2d Cir.1993); 147 F.R.D. 24 (S.D.N.Y.

this Court noted in an Opinion and Order filed fewer than two months ago: "the minions of organized crime continue to haunt the IBT. These invidious enemies of union democracy continue to thrive with a perverse and persistent energy." *United States v. International Bhd. of Teamsters,* 896 F.Supp. 1349, 1353–54 (S.D.N.Y.1995). In that Opinion and Order, this Court emphasized that insuring that the 1996 IBT elections remain free and democratic is vitally important to IBT members and to the nation:

It is of paramount importance that the same spirit of vigilance that vitalized the 1991 IBT election energize the 1995–96 IBT election process if the arduous and painstaking work of implementing the Consent Decree is to be preserved and built upon.... Rank and file Teamsters will watch this election with the hope that the Union will continue to be free and democratic. They will constantly be asking themselves whether the Union truly belongs to them. It is not just their interests that are at stake: The American public as a whole will benefit when this union of more than 1.4 million members is freed from the clutches of organized gangsterism. Union corruption takes an enormous toll on its members and the public. The sociological and economic cost it levies on society and on commerce is incalculable. *Id.*

■ In view of the import of the 1996 elections to IBT members and to the nation as a whole, the Election Officer's Letter raises an issue of deep concern. In this letter, the Election Officer contends that the Justice Department can only provide approximately $200,000 between now and November 13, 1995, despite the Election Office's need for $1,086,000 to oversee the IBT elections during this period. The Election Officer asserts that she requires this money in order to perform a number of functions, including: (1) mailing nomination meeting notices for 14 local unions; (2) monitoring the 27 nomination meetings that are scheduled to take place before November 13, 1995; (3) monitoring the printing and mailing of ballots for 13 local unions that are mailing ballots in October and November; (4) monitoring "Election Counts" for 15 local unions, and hiring staffs of workers to perform this func-

1992); 816 F.Supp. 852 (S.D.N.Y.1992), *rev'd,* 3 F.3d 634 (2d Cir.1993); 816 F.Supp. 864 (S.D.N.Y.1992), *aff'd,* 986 F.2d 15 (2d Cir.1993); 808 F.Supp. 271 (S.D.N.Y.1992); 808 F.Supp. 276 (S.D.N.Y.1992); 808 F.Supp. 279 (S.D.N.Y.1992), *aff'd,* 998 F.2d 120 (2d Cir.1993); 814 F.Supp. 1165 (S.D.N.Y.1993); 817 F.Supp. 337 (S.D.N.Y.1993), *aff'd,* 14 F.3d 183 (2d Cir.1994); 824 F.Supp. 406 (S.D.N.Y.1993), *aff'd,* 14 F.3d 183 (2d Cir.1994); 824 F.Supp. 410 (S.D.N.Y. 1993), *aff'd,* 19 F.3d 816 (2d Cir.1994); 826 F.Supp. 749 (S.D.N.Y.1993), *aff'd,* 22 F.3d 1091 (2d Cir.1994); 828 F.Supp. 258 (S.D.N.Y.1993); 829 F.Supp. 602 (S.D.N.Y.1993); 829 F.Supp. 608 (S.D.N.Y.1993); 831 F.Supp. 278 (S.D.N.Y. 1993); 151 F.R.D. 240 (S.D.N.Y.1993); 838 F.Supp. 800 (S.D.N.Y.1993), *aff'd,* 33 F.3d 50 (2d Cir.1994); 842 F.Supp. 1550 (S.D.N.Y.1994); 853 F.Supp. 757 (S.D.N.Y.1994); 871 F.Supp. 178 (S.D.N.Y.1994); 870 F.Supp. 557 (S.D.N.Y. 1994); 159 F.R.D. 437 (S.D.N.Y.1995); 878 F.Supp. 14 (S.D.N.Y.1995); 896 F.Supp. 1339 (S.D.N.Y.1995); 896 F.Supp. 1349 (S.D.N.Y. 1995); Order, Oct. 19, 1994, 1994 WL 577003; Order, Sept. 22, 1994, 1994 WL 520029; Order, July 12, 1994, 1994 WL 369403; Order, May 6, 1994; Order, April 26, 1994; Order, September 15, 1993, 1993 WL 364502; Order, August 18, 1993, 828 F.Supp. 258 (S.D.N.Y.); Order, August 2, 1993; Order, January 28, 1993, 1993 WL 22131; Order, January 26, 1993, 1993 WL 22131; Order, October 6, 1992, 1992 WL

297489; Order, July 14, 1992, 803 F.Supp. 748 (S.D.N.Y.); Order, June 2, 1992, 1992 WL 131771; Order, May 15, 1992, 792 F.Supp. 1346 (S.D.N.Y.); Memorandum & Order, January 28, 1992, 1992 WL 18280; Order, December 4, 1991; Opinion & Order, November 19, 1991, 1991 WL 334242, *rev'd,* 950 F.2d 94 (2d Cir. 1991); Memorandum & Order, November 8, 1991, 1991 WL 243292; Memorandum & Order, November 8, 1991, 1991 WL 243268, *aff'd,* 962 F.2d 4 (2d Cir.1992); Memorandum & Order, November 8, 1991, 1991 WL 243270; Order, October 29, 1991, 776 F.Supp. 144 (S.D.N.Y.); Order, October 25, 1991, 777 F.Supp. 1133 (S.D.N.Y.); Order, September 11, 1991; Memorandum & Order, August 14, 1991, 1991 WL 161084; Memorandum & Order, July 31, 1991, 1991 WL 150226, *aff'd,* 956 F.2d 1161 (2d Cir. 1992); Memorandum & Order, July 18, 1991, 1991 WL 136030, *aff'd,* 956 F.2d 1161 (2d Cir. 1992); Memorandum & Order, July 16, 1991, 1991 WL 136029; Order, June 6, 1991, 775 F.Supp. 90 (S.D.N.Y.); Order, May 1, 1991, 764 F.Supp. 787 (S.D.N.Y.); Order, April 11, 1991, 761 F.Supp. 315 (S.D.N.Y.); Memorandum & Order, April 3, 1991, 1991 WL 51065, *remanded,* 948 F.2d 98 (2d Cir.1991), *vacated as moot,* ——— U.S. ———, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992); Memorandum & Order, July 27, 1990, 1990 WL 169228; Memorandum & Order, April 6, 1990, 735 F.Supp. 519 (S.D.N.Y.); Order, March 16, 1990, 743 F.Supp. 155 (S.D.N.Y.).

tion; (5) reviewing and processing the 521 local union plans for winter elections that the Election Office has already received; (6) reviewing petitions for accreditation of slates of candidates for International Officer positions; (7) issuing decisions on the 45 election protests that have yet to be decided; (8) issuing decisions on newly filed election protests, which are currently "being filed at the rate of nine to ten per week"; (9) sending Election Office staff to a training program on November 10 and 11, which will "review election count procedures, protest investigation and resolution, and regional budgeting"; (10) preparing and disseminating to the largest IBT employers an advisory regarding the parking-lot-access rule that will apply in the 1996 election; (11) hiring a consultant with experience from the 1991 IBT Election to review the proposals solicited from election service and printing firms; and (12) updating the background, campaign finance, campaign contribution, and expenditure "instructions and forms to be filed by International Officer candidates on a quarterly basis." Election Officer's Letter at 1–2. To perform these functions, the Election Officer has already hired a substantial staff. *See id.* at 2. The Election Officer contends that the funding allocated to the Justice Department under the continuing resolution "is insufficient to meet the cost of our payroll, basic office operating expenses, overdue payments to CEO, Regional Coordinators and their adjunct staff, payment of the election Appeals Master and election related expenses through November 13." *Id.* at 2–3.

As previously noted, neither the Government nor the IBT disputes the Election Officer's representations. The Government concedes that it "cannot fund the Election Officer to the level provided in her budget," and the Government makes no claim that the Election Officer's budget is in any way unreasonable. Government's Letter at 1. Moreover, the IBT states that it has read the Election Officer's letter to this Court and "is in agreement with the proposed order" submitted with the Election Officer's Letter. IBT's Letter at 1.

There is no dispute that, under the Consent Decree, the Government is responsible for financing the 1996 IBT elections, and there is no dispute that the Government wishes to satisfy its obligations. The problem, however, is that it does not have the funds, does not control the purse strings, and must depend on the Congress to pass the necessary appropriation legislation. Thus, the process needs help.

It must be noted that both the Justice Department and the Congress have evinced a strong support for the Consent Decree and its goal of riding the IBT of the corrupting influence of organized crime. The Government and the Election Officer have represented to the Court that the Justice Department has worked steadily to secure adequate funding for the 1996 IBT elections. *See* Government's Letter at 1; Election Officer's Letter at 1. Moreover, both the United States House of Representatives and the United States Senate have passed appropriations bills for fiscal year 1996 that provide the Department of Justice with the $6 million needed to oversee the IBT elections. I believe that the Congress has demonstrated support for the Consent Decree and a firm resolve to rid the IBT of organized crime. Thus, the funding shortfall in the instant case has not been the result of a change of policy in the Congress. Rather, it has been caused by the fact that, under the continuing resolution, the Justice Department's funding is based on a *pro rata* portion of its 1995 budget. In light of the shear size of the federal budget and the budgetary problems that Senators and Representatives currently are grappling with, it is entirely understandable that the continuing resolution would not make specific reference to the Justice Department's funding of the 1996 IBT elections.

In sum, I believe an order is warranted in the circumstances attendant upon this case because the 1996 IBT elections are now at a critical juncture. As the Election Officer's letter makes clear, the 1996 IBT election process has not only begun but, indeed, it is underway. A failure to fund the Election Officer at this critical time will cause irreparable damage to the Consent Decree and will allow organized crime to bring harassment, coercion, intimidation, and other forms of

corruption back into the IBT election process.

In light of these circumstances, this Court has adopted and reprinted, with minor alterations, the proposed order that the Election Officer submitted with her letter.

## ORDER

WHEREAS the purpose of the March 14, 1989, Consent Decree that settled the claims of plaintiff the United States of America against, *inter alia*, defendant the International Brotherhood of Teamsters is to ensure that the IBT is maintained democratically, with integrity and for the sole benefit of its members without unlawful outside influence; and

WHEREAS since the Consent Decree was entered, the IBT held its first ever rank-and-file fully democratic election in 1991 under the close supervision of a court-appointed Election Officer, and court-appointed disciplinary officers have sanctioned more than 200 IBT members, many on the grounds that they knowingly associated with organized crime figures; and

WHEREAS a fair, free, honest and fully democratic IBT election is the linchpin in the Consent Decree's unique efforts to rid the IBT of corruption and the hideous influence of organized crime; and

WHEREAS vigilant supervision by the court-appointed Election Officer of all phases of the 1996 IBT election in accordance with the election rules adopted by this Court is central to ensuring a fair, free, honest and fully democratic IBT election for the benefit of the Union's 1.4 million members and the nation as a whole; and

WHEREAS the Government, in order to ensure a fair, free, honest and democratic 1996 IBT election, agreed under the Consent Decree to have a court-appointed Election Officer supervise that election at Government expense; and

WHEREAS the appropriations bills passed by the United States House of Representatives provides that "up to $6,000,000 of the amounts available to the Department of Justice for fiscal year 1996 may be allocated for this purpose, subject to either the repro-gramming authorities provided in Section 605 of this Act or the transfer authorities in Section 107 of this Act"; and

WHEREAS the substitute appropriations bills passed by the United States Senate for fiscal year 1996 provides that "of the amounts available to the Department of Justice in this act, up to $6,000,000 may be allocated to fund supervision of the 1996 International Brotherhood of Teamsters election, subject either to the reprogramming authorities provided in Section 605 of this Act or the transfer authorities in Section 107 of this Act"; and

WHEREAS final appropriations legislation setting the Department of Justice budget for fiscal year 1996 has not yet been enacted; and

WHEREAS the 1996 IBT election process is already underway and the Election Officer currently is supervising that election process, and irreparable harm will occur to the election process if the funding for the supervision is interrupted or delayed until final appropriations legislation for the Department of Justice for fiscal year 1996 is enacted;

IT IS THEREFORE ORDERED THAT until such time as final appropriations legislation for the Department of Justice for fiscal year 1996 is enacted, the Department of Justice shall allocate the funds necessary to supervise the 1996 IBT election, such funds not to exceed the $6,000,000 set forth in the appropriations bills passed by the United States Senate and House of Representatives.

SO ORDERED.